[No. B177196. Second Dist., Div. Five. Dec. 7, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
CARY RINGO, Defendant and Appellant.

**Counsel**

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Robert F. Katz and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KRIEGLER, J.**—The trial court convicted defendant and appellant Cary Ringo of dissuading a witness by force or threat (Pen. Code, § 136.1, subd. (c)(1)),[1] felon in possession of a firearm (§ 12021, subd. (a)(1)), and first degree residential burglary (§ 459).[2] The trial court found that defendant had suffered two prior strike convictions within the meaning of section 667, subdivisions (b) through (i) and section 1170.12, subdivisions (a) through (d) and two prior serious felony convictions within the meaning of section 667, subdivision (a). The trial court also found defendant had served two prior prison terms within the meaning of section 667.5, subdivision (b). Pursuant to an agreement to limit punishment to 18 years in prison if defendant agreed to a court trial, defendant was sentenced to a prison term of 16 years, calculated by doubling the sentences for the substantive offenses under the "Three Strikes" law and imposing two 5-year enhancements for the serious felonies.

In this timely appeal, defendant contends he was denied his right to meaningful access to the courts, the trial court failed to obtain a waiver of advisory counsel's conflict of interest, substantial evidence does not support the burglary conviction, and his prior conviction of making a criminal threat in violation of section 422 was not a serious felony under section 667, subdivision (a). Rejecting these contentions, we affirm.

## STATEMENT OF FACTS

Defendant began dating Shirelle Davis in February 2003. As a result of defendant's domestic violence, threatening telephone calls, and other harassment, Davis obtained a restraining order in June 2003 and broke off their relationship. On July 22, 2003, defendant persuaded Davis to meet with him to discuss resuming their relationship. Defendant became angry when Davis told him their relationship was over. He grabbed her arm, and while trying to pry her car keys from her fingers, wrestled Davis to the ground. When neighbors interceded, Davis broke free and drove away; but instead of going home, Davis reported the incident to the sheriff.

Dwight Yates lived next door to Davis. On the morning of July 23, 2003, Yates went to work, leaving his house locked and secured. Upon his return home, Yates found a previously secured screen was off of a bedroom window and a table had been moved under the window. A coin jar containing more than $200, which had been by the window in the bedroom, was missing, as

---

[1] All further statutory references are to the Penal Code.

[2] Pursuant to section 1118, the trial court acquitted defendant of the charge of stalking in violation of section 646.9. After trial, the trial court found defendant not guilty of an additional charge of residential burglary and making a criminal threat in violation of section 422.

was Yates's watch. Yates found a pair of boots in the backyard, which were later identified by Davis as boots she had seen being worn by defendant. Later that day, Davis saw defendant wearing a watch she had never seen him wear before. Defendant was in possession of Yates's watch at the time of his arrest.

Also on July 23, 2003, defendant went to Davis's house and waited for her. When Davis arrived home, she saw defendant in his stocking feet with a gun in his hand.[3] Defendant was upset and angry, asking if Davis had filed a restraining order or a police report the day before. Frightened by defendant's aggressive questioning, Davis denied filing a police report. Davis's brother, who overheard the encounter, called the police. Police officers arrived a short time later. When the officers knocked on the door and announced themselves, defendant ran into Davis's bedroom and hid the gun in a closet. Defendant was apprehended coming out of the bedroom in his stocking feet, wearing Yates's watch.

## DISCUSSION

## I

## DEFENDANT IS NOT ENTITLED TO REVERSAL ON THE GROUND HE WAS DENIED ACCESS TO THE COURTS

Defendant argues he was denied meaningful access to the courts under the California Constitution and the Fourteenth Amendment. Defendant claims he was denied access to legal research, police reports, the telephone, defense witnesses, and the law library. These transgressions are also alleged to have infringed upon defendant's right to self-representation, contrary to the Sixth and Fourteenth Amendments. We reject defendant's arguments on both procedural and substantive grounds.

A. *The Background of Defendant's Claim*

In order to put defendant's complaints in proper perspective, we set forth the pertinent portion of the record in some detail. Defendant was granted propria persona status on December 4, 2003. The trial court granted him supplies and propria persona telephone funds, and appointed an investigator

---

[3] Defendant admitted having suffered a prior felony conviction for purpose of the felon in possession of a firearm charge.

to assist him. Between December 4, 2003, and April 2, 2004, defendant was granted propria persona funds a total of eight times. Defendant served an informal discovery letter and filed 12 motions, supported by legal research. Trial was scheduled to begin on April 9, 2004.[4]

On April 2, defendant appeared in court with Omar Bakari, a private attorney who served as defendant's advisory counsel.[5] The trial court assured defendant that his propria persona privilege would remain along with advisory counsel, and defendant agreed that he and advisory counsel would work as a team. When defendant stated he needed a subpoena served, but his investigator had already been relieved, the trial court offered to appoint another investigator.

On April 9, defendant answered ready for trial. Defendant did not seek a continuance, nor did he advise the trial court he had been denied access to the law library or was in any way unprepared. The trial court granted defendant's oral request for $40 in additional funds. Trial proceedings were held on April 16, 19, and 20, with no mention by defendant of any difficulty with trial preparation or access to the law library.

On April 21, after two witnesses testified, defendant, for the first time, raised the issue of law library access by stating, "Your Honor, I have a problem. Since last night, I have not had access to the law library or any—I am still stuck in third gear. [¶] . . . [¶] Since even during trial, I need to file some paperwork. I have no access." The trial court agreed to see if defendant could be housed at the custody facility at Wayside rather than at the central jail.

When trial resumed on April 22, defendant thanked the trial court, who responded that defendant should "thank the Sheriff's Department. They did that. They went and did that." Later in the day, defendant said he had not had a chance to get to the law library, so he asked to make an oral motion for acquittal. A subsequent discussion led to a continuance of the trial to the following afternoon. Defendant expressed his desire to go back to the Wayside facility, stating that when he was at county jail, he was rushed to a hospital in a patrol car and he had no access to a telephone. Proceedings were held on April 23, without a complaint by defendant regarding access to the law library or general ability to prepare for trial. The trial was in session

---

[4] All references to trial dates are to 2004.

[5] It is unclear from the record whether Bakari was appointed by the trial court or retained by defendant to serve as advisory counsel.

again on May 3 for proceedings on the prior conviction allegations. Defendant told the trial court, "Your Honor, I haven't been at the law library since the 7th. I had all those police reports. I just got to the law library this Saturday. All my stuff that was in Wayside, I never did go."

B. *Discussion*

We reject defendant's contention of denial of access to the courts for six reasons. First, defendant has forfeited the issue by failing to raise the matter in the trial court in a timely fashion and by failing to request a remedy in the trial court. Defendant did not even mention a problem with access to the law library and impairment of his ability to prepare until the fifth day of trial. Even when he did raise the issue on April 21, defendant did not affirmatively ask for a continuance or any other specific remedy. By failing to make a timely objection or motion, defendant deprived the trial court of the opportunity to promptly determine if there had been a violation of defendant's rights and, if necessary, correct the situation. (See *People v. Simon* (2001) 25 Cal.4th 1082, 1103 [108 Cal.Rptr.2d 385, 25 P.3d 598].) Because of the lack of a timely objection, and the failure to request a specific remedy, we deem the issue forfeited.

■ Second, to the extent defendant relies upon the Sixth Amendment, his contention is without merit, because defendant had advisory counsel. " 'When the defendant has a lawyer acting as advisory counsel, his or her rights are adequately protected. [Citations.]' [Citation.]" (*People v. Blair* (2005) 36 Cal.4th 686, 733 [31 Cal.Rptr.3d 485, 115 P.3d 1145]; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 1040 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

Third, the real issue is whether defendant "had reasonable access to the ancillary services that were reasonably necessary for his defense." (*People v. Blair, supra,* 36 Cal.4th at p. 734.) Defendant's advisory counsel cross-examined witnesses, made objections, argued defendant's section 995 motion to dismiss the information, and made a closing argument, thereby protecting defendant's Sixth Amendment rights. In arguing to the trial court and cross-examining witnesses, defendant quoted from and referred to the police reports, preliminary hearing transcripts, transcripts of recorded telephone calls and messages, reports of his investigator, records of witness's prior convictions, witness statements to the police, a weapons report, and the police property report. Defendant requested and was granted additional propria persona funds for a telephone, which indicates he had access to the telephone.

(2) Fourth, defendant's assumption that he had a constitutional right to law library access even when assisted by advisory counsel is doubtful. The California Supreme Court has never so held. (*People v. Lawley* (2002) 27 Cal.4th 102, 147, fn. 18 [115 Cal.Rptr.2d 614, 38 P.3d 461] (*Lawley*) [recognizing, but not addressing the issue].) Indeed, the United States Supreme Court recently observed in a unanimous opinion that it has never recognized a propria persona defendant's right to law library access under the Sixth Amendment. (*Kane v. Garcia Espitia* (2005) 546 U.S. 9 [163 L.Ed.2d 10, 126 S.Ct. 407] (*per curiam*).) Given the decision in *Kane*, we are satisfied there is no Sixth Amendment right to law library access where a propria persona defendant is assisted by advisory counsel.

Fifth, defendant presented no competent evidence of deprivation of those services necessary to provide access to the court. Defendant never substantiated his claims with testimony under oath or a declaration under penalty of perjury. We are disinclined to reverse a judgment, otherwise lawful on its face, on the basis of defendant's unsworn and belated statements to the trial court.

Sixth, defendant has made no showing of prejudice. "To the extent defendant may have been denied access to any resources, the denial was minimal and defendant has failed to demonstrate any resulting prejudice. Defendant thus has not established any violation of his Sixth Amendment right to self-representation or his Fourteenth Amendment right to equal protection of the laws." (*People v. Blair, supra,* 36 Cal.4th at p. 736.)

## II

## DEFENDANT IS NOT ENTITLED TO REVERSAL DUE TO A CONFLICT OF INTEREST BY ADVISORY COUNSEL

Before trial commenced, Advisory Counsel Bakari realized that he was friends with Yates. Defendant contends this friendship created a conflict of interest on the part of advisory counsel and adversely affected his state and federal rights to due process. Defendant contends the trial court's failure to inquire further and obtain defendant's waiver of his advisory counsel's conflict of interest was an abuse of discretion. We conclude the trial court did not abuse its discretion.

Bakari told the trial court that he had immediately disclosed the friendship with Yates to defendant. He then disclosed the relationship to the trial court and indicated he would not be constrained in cross-examining Yates. The trial court advised defendant that one of the witnesses against him happened to be a friend of Bakari, and defendant responded, "Okay." Bakari stated he thought defendant had confidence that the friendship would not compromise Bakari's relationship with defendant. The trial court saw no need to relieve Bakari or further pursue the matter with defendant.

The instant case is controlled by the holding in *Lawley*. In *Lawley*, the advisory counsel for the propria persona defendant, who faced the death penalty, had briefly represented a prosecution witness in the case. The contact between advisory counsel and the prosecution witness was limited to a meeting with the witness in court, at which counsel introduced himself to the witness and told her they would talk at a later time. Before they ever discussed her cases, the witness became seriously ill, was admitted to a hospital, and her recovery and ability to testify were in doubt. Advisory counsel recognized a "problem" in connection with his representation of the witness, but he did not regard the problem as an actual conflict because he had never discussed her cases or any other case with the witness. Lawley told the court he was not waiving any conflict, but also that he would not waive time for trial in order to find new advisory counsel. In view of the seriousness of the case and the potential conflict of interest, the trial court discharged advisory counsel, but later reconsidered its ruling and reinstated the appointment after receiving assurances that advisory counsel " 'certainly wouldn't pull any punches and my relationship, such as it was with [the witness], would not affect my representation or advisory representation to Mr. Lawley in any manner whatsoever.' " (*Lawley, supra*, 27 Cal.4th at p. 144.) Advisory counsel stated he would not undertake any future representation of the witness and would resist any attempt to reappoint him to her cases, should they be revived. (*Id.* at p. 145.)

Relying upon these circumstances, the defendant in *Lawley* argued his advisory counsel had a conflict of interest stemming from his representation of the prosecution witness; defendant never waived the conflict; and he was coerced into accepting advisory counsel by virtue of the trial court's professed inability to find other advisory counsel for him under the circumstance that defendant refused to waive time. (*Lawley, supra*, 27 Cal.4th at p. 143.)

■ In rejecting Lawley's arguments, our Supreme Court observed that although there is no constitutional right to the appointment of advisory counsel, "when such counsel is appointed the defendant is entitled to expect

professionally competent assistance within the narrow scope of advisory counsel's proper role [citation]. Professionally competent assistance comprises assistance unaffected by conflict of interest. [Citations.] 'When the trial court knows, or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel, it is required to make inquiry into the matter.' [Citation.] The court, upon inquiring, may decline to relieve counsel if it determines the risk of a conflict is too remote. [Citations.] In making its determination, the court may rely on the representations of defense counsel that no conflict exists. [Citation.] To obtain relief on appeal, the defendant must establish the existence of an actual conflict that adversely affected counsel's performance. [Citation.]" (*Lawley, supra,* 27 Cal.4th at pp. 145–146.)

Having determined that advisory counsel must be free of an actual conflict and that advisory counsel in *Lawley* did establish an attorney-client relationship with the witness, "in order to find that [advisory counsel] labored under a conflict of interest during the period when he was advising defendant, we would have to conclude that [advisory counsel's] duty of loyalty to [the witness] as a former client potentially could have hampered his performance as defendant's advisory counsel, such as by causing him to 'pull his punches' in assisting defendant in cross-examining her. [Advisory counsel] disclaimed such a possibility, and we may reasonably rely on that disclaimer, especially given [advisory counsel's] assurance he would not undertake any future representation of [the witness]. [Citation.] For this reason, defendant's insistence in the trial court that he was 'not waiving any conflict' fails to bring this case within the rule in *Holloway v. Arkansas,* [(1978) 435 U.S. 475,] 488 [55 L.Ed.2d 426, 98 S.Ct. 1173], where the high court articulated a rule of automatic reversal in situations where a trial court requires the continuation of conflicted representation over a timely objection. In any event, assuming some potential conflict not apparent on this record, defendant fails to demonstrate it adversely affected [advisory counsel's] performance . . . ." (*Lawley, supra,* 27 Cal.4th at p. 146.)

The instant case presents a weaker showing of an actual conflict of interest than that in *Lawley.* Yates was only a friend of Bakari's; he was not a client or a former client. Bakari had no responsibilities or loyalty to Yates, much less any duties that would threaten Bakari's fidelity to defendant or efforts on defendant's behalf. Moreover, defendant has failed to establish that the friendship adversely affected Bakari's performance. Bakari cross-examined Yates, pressing him on the weaknesses of central aspects of his story, suggesting a motive to fabricate, and eliciting testimony that Yates was

unable to identify his watch when the police showed him a photograph of it. After Bakari cross-examined Yates, defendant asked additional questions on cross-examination and conducted the recross-examination. After trial, the trial court stated for the record that Bakari had "worked very hard for [defendant]." We are satisfied Bakari's friendship with Yates had no impact on the trial and provides no basis for reversal of the judgment.

## III

### THE BURGLARY CONVICTION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Defendant contends the evidence was insufficient to support the burglary conviction at the time he made his motion for acquittal under section 1118. We disagree and find the necessary substantial evidence to support the judgment.

In assessing a claim of insufficiency of the evidence, the reviewing court's task is to "review the whole record in the light most favorable to the judgment . . . to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) Where a defendant challenges the sufficiency of the evidence at the conclusion of the prosecution's case-in-chief under section 1118, the reviewing court must view the evidence as it stood at the end of the prosecution case. (*People v. Belton* (1979) 23 Cal.3d 516, 520–523 [153 Cal.Rptr. 195, 591 P.2d 485].)

"Every person who enters any [building] . . . [with the specific intent to steal, take, and carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of that property] . . . is guilty of the crime of burglary in violation of Penal Code [section] 459. [¶] . . . [¶] In order to prove this crime, each of the following elements must be proved: [¶] 1. A person entered a [building] . . . ; and [¶] [2. At the time of the entry, that person had the specific intent to steal and take away someone else's property, and intended to deprive the owner permanently of that property]." (CALJIC No. 14.50.)

The evidence, viewed in the light most favorable to the judgment, establishes the commission of a burglary and substantial evidence of defendant's

guilt of that crime. There is no dispute that Yates left his home locked and secured, only to find that an entry was made through a bedroom window. A watch and jar of coins was missing, and the area was in disarray. From these facts, there can be no doubt a burglary was committed.

There was also substantial evidence, at the close of the prosecution's case-in-chief, that defendant was the burglar. He frequently wore boots, and Davis testified the boots found in Yates's yard were boots she had seen defendant wear. The boots were compared to defendant's jail shoes during trial and were close to the same size. At trial, defendant tried on the boots, and there was expert testimony that they fit him. On the day of the burglary, Davis saw defendant wearing a watch she had not seen him wear in the past. Yates did not see his watch again until he was shown a photograph of a watch by a detective, and Yates identified his watch at trial. Defendant was unquestionably in the area of the Yates residence around the time of the burglary, in that he was arrested shortly thereafter at the house next door. Further, defendant was not wearing shoes at the time Davis saw him and at the time of his arrest, consistent with someone who for whatever reason had left his footwear somewhere else. One reasonable inference to be drawn from the totality of this evidence is that defendant went to Yates's yard, moved the picnic table by the window, removed his boots, entered the residence, and removed the watch and coin jar, but departed before he gathered his boots. Defendant then went next door to Davis's residence, shoeless, and was ultimately arrested. This is substantial evidence supporting defendant's burglary conviction.

Defendant makes much of the fact that the prosecution rested its case-in-chief without calling a police witness to testify that Yates's stolen watch was in defendant's property since the time of his arrest. In our view, this lack of proof is of no significance. The inference that the watch in question was Yates's stolen watch is compelling, even without testimony that the watch had been retrieved from property booked to defendant. The police arrested defendant on the day of the burglary, and the police had Yates's watch in their possession thereafter. Yates identified his watch from a photograph that Detective Morales showed him two weeks after defendant's arrest, supporting the inference defendant possessed Yates's watch at the time of his arrest. This inference is bolstered by Davis's testimony that although defendant normally did not wear a watch, he was wearing one on the day of his arrest. There was reasonable, solid, and credible evidence that defendant committed the burglary of the Yates residence.

**IV**

**A PRE-PROPOSITION-21 CONVICTION FOR
MAKING A CRIMINAL THREAT IS A SERIOUS
FELONY UNDER SECTION 667, SUBDIVISION (A)**

The trial court imposed a five-year enhancement pursuant to section 667, subdivision (a),[6] based upon defendant's February 1996 conviction for making a criminal threat (§ 422). Defendant argues that section 422 was not a serious felony in February 1996 and did not become a serious felony until the passage of Proposition 21, effective March 8, 2000.[7] Eschewing an ex post facto argument,[8] defendant instead contends that as a matter of statutory interpretation, only convictions of section 422 occurring after the passage of Proposition 21 can constitute serious felonies.

Defendant's argument is that when enacted by the Legislature, section 667, subdivision (h), contained a lock-in date of June 30, 1993, fixing the list of serious felonies that qualify as strike offenses. Defendant reasons that when the voters passed Proposition 21, the lock-in date was changed for purposes of the Three Strikes law to include additional offenses such as violations of section 422,[9] but no similar change was made as to the five-year enhancement for serious felonies, meaning the list of serious felonies remained fixed. As a result, defendant reasons that his 1996 conviction of violating section 422—not a serious felony at the time of its commission—did not qualify as a serious felony in the instant case. Under defendant's reading of section 667, a

---

[6] Section 667, subdivision (a) provides in pertinent part: "(1) . . . [A]ny person convicted of a serious felony who previously has been convicted of a serious felony in this state . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively. [¶] . . . [¶] (4) As used in this subdivision, 'serious felony' means a serious felony listed in subdivision (c) of Section 1192.7."

[7] Proposition 21 took effect on March 8, 2000. (*John L. v. Superior Court* (2004) 33 Cal.4th 158, 167 [14 Cal.Rptr.3d 261, 91 P.3d 205].)

[8] Defendant concedes there is no constitutional bar, under the state and federal ex post facto provisions, to his prior section 422 conviction being considered a serious felony. (See *People v. Hatcher* (1995) 33 Cal.App.4th 1526, 1527–1528 [39 Cal.Rptr.2d 801].)

[9] "The serious felonies qualifying as strikes under the initiative include exploding a destructive device causing bodily injury; certain felonies committed in connection with a street gang in violation of Penal Code section 186.22; throwing acid or a flammable substance; assault with a deadly weapon; assault on a peace officer or firefighter; assault with a deadly weapon against a public transit employee, custodial officer, or school employee; discharge of a firearm at an inhabited dwelling, vehicle, or aircraft; rape in concert; shooting from a vehicle; intimidation of victims or witnesses; and terrorist threats. (Pen. Code, § 1192.7, subd. (c), as amended by Prop. 21, § 17.)" (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 577 [117 Cal.Rptr.2d 168, 41 P.3d 3].)

conviction for violating section 422 is only a serious felony if the conviction was suffered after the effective date of Proposition 21.

■ The applicable standard of review of matters of statutory interpretation is well settled. "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language 'in isolation.' [Citation.] Rather, we look to 'the entire substance of the statute . . . in order to determine the scope and purpose of the provision . . . . [Citation.]' [Citation.] . . . We must harmonize 'the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole.' [Citations.]" (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].)

■ " 'In interpreting a voter initiative . . . we apply the same principles that govern statutory construction. [Citation.] Thus, "we turn first to the language of the statute, giving the words their ordinary meaning." [Citation.] The statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme [in light of the electorate's intent]. [Citation.] When the language is ambiguous, "we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.]' [Citation.] In other words, 'our primary purpose is to ascertain and effectuate the intent of the voters who passed the initiative measure.' [Citation.]" (*People v. Briceno* (2004) 34 Cal.4th 451, 459 [20 Cal.Rptr.3d 418, 99 P.3d 1007].)

Defendant's statutory interpretation argument is based on the faulty premise that the lock-in date for qualifying offenses under the Three Strikes law also applies to the five-year serious felony enhancement under section 667, subdivision (a). Defendant's argument fails to appreciate that section 667 embodies two distinct statutory schemes, each of which operates independently of the other: (1) the five-year enhancement for serious felony prior convictions, as set forth in subdivision (a); and (2) the Three Strikes law, as set forth in subdivisions (b) to (j). While some of the concepts of the two separate schemes are interrelated—a serious felony can be the basis of a five-year enhancement and also serve as a qualifying strike—the two schemes are not otherwise dependent.

■ It is true, as defendant argues, that the Legislature's version of the Three Strikes law in section 667 fixed the list of qualifying strike offenses as of June 30, 1993. (§ 667, subd. (h) ["All references to existing statutes in subdivisions (c) to (g), inclusive, are to statutes as they existed on June 30,

1993."].) But defendant's argument fails, because the lock-in date of subdivision (h) applies only to the Three Strikes law portion of section 667, as evidenced by its reference to subdivisions (c) to (g), and its absence of a similar reference to subdivision (a).

Prior to the passage of Proposition 21, a criminal threat in violation of section 422 was not listed as a serious felony in section 1192.7.[10] However, Proposition 21 expanded the list of serious felonies to include section 422 as of March 9, 2000. (§ 1192.7, subd. (c)(38).) Proposition 21 also enacted section 667.1, providing that "[n]otwithstanding subdivision (h) of Section 667, for all offenses committed on or after the effective date of this act, all references to existing statutes in subdivisions (c) to (g), inclusive, of Section 667, are to those statutes as they existed on the effective date of this act, including amendments made to those statutes by this act." Section 667.1 "change[s] the 'lock-in' date for determining the existence of qualifying offenses (such as violent or serious felonies) under the [legislative version of the] Three Strikes law [section 667, subdivisions (b) to (i)]" from June 30, 1993, to March 8, 2000.[11] (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 574 [117 Cal.Rptr.2d 168, 41 P.3d 3].)

■ Defendant argues the fact that the change in the lock-in date was made only to the Three Strikes law and not to section 667, subdivision (a), "implied [that the] section 667, subdivision (h) operative date of June 30, 1993, still applies to section 667, subdivision (a)(1) allegations." To the contrary, the June 30, 1993 lock-in date in subdivision (h) is applicable only to the three strikes provisions of section 667, and has never been applicable to the five-year enhancement in subdivision (a).

■ Based upon the plain language of section 667, subdivision (a), the crucial date for determining if a prior conviction qualifies as a serious felony is the date of the charged offense. If the alleged prior conviction is included in the list of serious felonies in section 1192.7 on the date of the charged offense, the prior conviction qualifies for the five-year enhancement under subdivision (a). At the time defendant committed the current offenses, his prior conviction of section 422 was a serious felony "listed" in section 1192.7, subdivision (c)(38). Therefore, the five-year enhancement of section 667, subdivision (a)(1) was properly applied to his sentence.

---

[10] Section 1192.7 provides in pertinent part: "(c) As used in this section, 'serious felony' means any of the following: [¶] . . . (38) criminal threats, in violation of Section 422 . . . ."

[11] Section 1170.125, which refers to the initiative version of the Three Strikes law, section 1170.12 (added by voter initiative Prop. 184, approved Nov. 8, 1994) was also added by Proposition 21 and is to the same effect. (*Manduley v. Superior Court, supra,* 27 Cal.4th at pp. 574–575.)

## DISPOSITION

The judgment is affirmed.

Turner, P. J., and Mosk, J., concurred.

A petition for a rehearing was denied December 30, 2005, and appellant's petition for review by the Supreme Court was denied March 15, 2006, S140367. George, C. J., did not participate therein.