Filed 8/15/25  P. v. Ortiz CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C100972 |
| v. | (Super. Ct. No. CR202100731) |
| ESTEBAN ANTONIO ORTIZ, | |
| Defendant and Appellant. | |

During the relevant time period, defendant Esteban Antonio Ortiz worked as a security guard at Woodland Memorial Hospital.  In August 2020, he and other security

guards believed the victim, J.S., was obstructing the hospital ambulance bay and moved the victim forcefully to a nearby sidewalk. J.S. said he was having a seizure. A struggle ensued in which J.S. said he was punched, kicked, and thrown to the concrete.

Following a bench trial, the trial court found defendant guilty of dependent adult abuse under circumstances likely to produce great bodily harm, assault by means of force likely to produce great bodily injury, and battery. The trial court placed defendant on formal probation for two years.

Defendant now contends there is insufficient evidence to support the conviction for dependent adult abuse. He argues the trial court should have granted defendant's motion for judgment of acquittal. In addition, defendant contends there is insufficient evidence to support the conviction for assault by means of force likely to produce great bodily injury. He argues we should modify the conviction from felony assault to simple assault and remand for resentencing.

We conclude sufficient evidence supports the convictions. We will affirm the judgment.

BACKGROUND

The victim, J.S., had suffered a traumatic brain injury in 2013 as the result of an accident. He had difficulty with concentration and short-term memory, and used coping mechanisms to remember things, such as recording conversations. Although he lived by himself and drove, his family helped him with chores and medications. He had about 14 different medications in August 2020, including for seizures.

J.S. experienced epileptic and focal seizures. Lights, stress and anxiety could cause seizures and make them worse. Symptoms of his epileptic seizures included falling to the ground, losing control of his bladder, drooling, and blowing spit out of his mouth.

Although he could not tell when he was about to have an epileptic seizure, he could tell when he was getting a focal seizure. He could control a focal seizure by putting a cold towel over his head and neck and staying in a cool, dark and quiet place

2

for 15 minutes. His focal seizures started with muscle twitching in his legs, eye blinking, and feeling warm in the back of his neck and head. His focal seizure could develop into an epileptic seizure if not controlled.

On August 1, 2020, J.S. went to Woodland Memorial Hospital to obtain pain medication. But he became increasingly anxious as he waited in the waiting room. J.S. recorded what happened on his cell phone, and the audio recording was played at trial.

On the recording, J.S. informed hospital security guard Brandon Binford he had to go outside because the lights in the waiting room were bothering him. J.S. told Binford he might get a seizure. Moaning and groaning sounds can be heard on the audio recording after J.S. spoke with Binford. According to J.S., those sounds were vocal tics or related to J.S.'s Tourette's Syndrome. J.S. left the waiting room and went outside and knelt down in the first dark spot he found, feeling dizzy and unable to walk. He was in the hospital's ambulance bay.

On the recording, a man asked what was wrong. J.S. requested a wet towel. When a woman asked what was going on, J.S. said he needed a wet towel. A man summoned J.S., telling him he was in the middle of the ambulance bay. J.S. and another witness identified the male voice as that of Binford. When a woman inquired about the circumstances, J.S. explained he was having a focal seizure and needed a wet towel. A witness identified the female voice as possibly that of a hospital employee.

J.S. saw a cooler, removed some water bottles, poured water on his shirt, and put the shirt on his neck. Water sounds can be heard on the recording. J.S. told security guards he needed "something fuckin' wet" and had asked for it. A man said J.S. was "in the middle of the road" and that J.S. was cursing at them so his pain must have gone away. J.S. said he was having a focal seizure. A man answered that he did not care what J.S. was having, J.S. had gone through their things and the water was not for J.S.

3

A male voice asked whether J.S. had checked in. J.S. said that he had, but repeated that he was having a focal seizure; he explained he would have an epileptic seizure if he did not cool down. A male voice said J.S. was not checked in anymore because he had walked outside.

A male voice said J.S. was in the middle of the ambulance bay and had to leave. J.S. told the guards he had to be seen immediately. A male voice said J.S. came in for pain pills, not for a seizure, and pain pills were not a priority. J.S. yelled that he was having a seizure. A male voice said J.S. was being loud and he should chill. J.S. asked to be left alone for 15 minutes, saying he would have a seizure if the guards moved him. A male voice said no because J.S. was in the middle of the ambulance bay.

Shortly thereafter, a male voice told J.S. he would be escorted off the property. The man ordered J.S. to gather his belongings and mentioned a wheelchair. J.S. testified that he physically could not leave at that point. He asked the guards not to touch him. A male voice replied that J.S. seemed alright. J.S. asked if the person saw his leg. J.S. testified that his leg was twitching.

The guards tried to put J.S. in a wheelchair and he had a seizure. According to J.S., the guards laid him across the handles of the wheelchair and pushed the wheelchair down the driveway as his head hit the pavement.

Groaning sounds can be heard on the recording. Defendant told J.S. to shut up and get in the "god damn chair." A male voice accused J.S. of spitting at his partner and said, "get in the fuckin' chair." J.S. testified one of the guards hit him hard in the face with a closed-fist punch while the other guard held his shoulder and he was hit again when one of the guards accused him of spitting on his partner. J.S. testified he was having a seizure, his movements were involuntary, and he did not spit at anyone. He could be heard groaning and making sounds of pain on the recording and being wheeled away while male voices cursed at him. Then a male voice said something about a "nice little bed." J.S. testified the guards dumped him on the sidewalk.

4

J.S. testified the guards kicked him, he was "out of it," and he was about to have another seizure. On the recording, a male voice told J.S. to keep that spitting to himself, and a male voice said something about getting punched in the face. Male voices suggested J.S. had been faking a seizure. J.S. testified a guard got on top of him, punched him, and held his wrist down, while another guard kicked him. He said one of the guards cut off his hospital wristband. J.S. had another seizure and convulsed on the sidewalk, hitting his head.

J.S. later called 911 to report that he had been assaulted. He had a bump on his forehead, bruises, cuts, and scrapes. Responding police officer Marcuss Hernandez testified that J.S. appeared disoriented. The officer interviewed J.S. and concluded J.S. had some type of disability. The officer believed J.S. had a speech impediment or Tourette's Syndrome. A video recording of the officer interview with J.S. was played at trial. The officer determined defendant was one of the security guards who interacted with J.S.

Woodland Memorial Hospital security guard Elias Alexander testified at trial. He helped defendant and Binford get J.S. in a wheelchair. He testified that J.S.'s body was clenched up, his eyes were closed, his arms were crossed in a "mummy position," and he had a smirk on his face. The smirk made Alexander think J.S. was acting intentionally. According to Alexander, defendant and Binford tilted the wheelchair to get J.S. to stand up, but J.S. fell forward out of the wheelchair onto the sidewalk. Alexander did not see anyone kick or punch J.S. He did not see J.S. spit, but he heard Binford say that J.S. spat on him as they moved J.S. to the sidewalk.

Defendant provided the following account at trial. He went to the emergency room (ER) entrance when he got a call from Binford. Defendant saw J.S. on his knees with water on his head. J.S. was agitated and aggressive, and his speech was unintelligible at times. Defendant thought J.S. was under the influence of a narcotic or alcohol. Defendant did not observe any visual cues of a seizure. J.S.'s eyes were open

5

and he was able to speak with defendant. His legs were relaxed and he did not lose consciousness. According to defendant, an ER technician tried to assess J.S., but J.S. refused to speak and was aggressive with the technician. Defendant said the technician concluded J.S. was not having a seizure and could be discharged. Defendant acknowledged, however, that the alleged interaction with the technician was not on the audio recording.

Defendant said he and Binford grabbed J.S.'s arms, put him in a wheelchair, and moved him to the sidewalk. J.S. was not placed across the wheelchair handles, he sat in the wheelchair. Defendant testified that J.S. spat at Binford. Defendant believed the spitting was intentional because J.S.'s eyes were open, he made an effort to collect spit in his mouth before he spat, and his spit came out forcefully. In response, defendant forcefully placed his open palm on J.S.'s jaw and moved his face away to prevent J.S. from spitting at them.

According to defendant, Alexander assisted in moving J.S. J.S.'s head did not hit the pavement as they wheeled him. Defendant and Binford removed J.S. from the wheelchair by picking him up by his arms and placing him on his knees on the sidewalk. Defendant did not dump J.S. out of the wheelchair and he did not punch or kick J.S. He added that Binford did not punch J.S. Defendant believed J.S. deliberately hit his head against the concrete. Defendant and Binford placed J.S. in a landscape area after defendant hit his head.

Defendant testified that he cut off J.S.'s wristband. Although not reflected on the recording, defendant said he asked J.S. for permission to cut off the wristband and J.S. nodded yes. J.S. eventually got up by himself and walked away without stumbling.

The trial court found J.S.'s testimony credible. It found defendant guilty of dependent adult abuse under circumstances likely to produce great bodily harm

(Pen. Code, § 368, subd. (b)(1) – count 1),[1] assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4) – count 2), and battery (§ 242 – count 3). It found true allegations that the crime involved great violence, great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness; that the victim was particularly vulnerable; and that defendant took advantage of a position of trust or confidence. The trial court placed defendant on formal probation for two years.

## DISCUSSION

## I

Defendant contends there is insufficient evidence to support his conviction for dependent adult abuse. He claims the trial court should have granted his motion for judgment of acquittal.

After the People rested their case, defendant moved for judgment of acquittal under section 1118. He claimed he did not know J.S. was a dependent adult. The trial court denied the motion, finding from the evidence presented, including all reasonable inferences, that there was sufficient evidence of each element of the offense.

In reviewing a section 1118 ruling, we review the whole record as it stood at the end of the prosecution case " 'in the light most favorable to the judgment . . . to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Ringo* (2005) 134 Cal.App.4th 870, 880; see *People v. Zamudio* (2008) 43 Cal.4th 327, 357, 360, fn. 17 (*Zamudio*).) We presume every fact in support of the judgment that the trier of fact could reasonably have deduced from the evidence. (*Zamudio,* at p. 357.) " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a

---

[1] Undesignated statutory references are to the Penal Code.

7

judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' " (*Ibid.*)

Section 368 provides that when someone knows or reasonably should know that another person is a dependent adult, it is unlawful to willfully cause the dependent adult to suffer, or to inflict upon the dependent adult unjustifiable physical pain or mental suffering, under circumstances or conditions likely to produce great bodily harm or death. (§ 368, subd. (b)(1); Stats. 2018, ch. 70, § 3.) A "dependent adult" is a person between the ages of 18 and 64 with physical or mental limitations that restrict the person's ability to carry out normal activities or protect his or her rights, including a person with physical or developmental disabilities. (§ 368, subd. (h).) The victim need not be incapable of carrying out normal activities or of protecting his or her rights; it is sufficient if the victim's ability to do so is limited in some significant way. (*People v. Matye* (2008) 158 Cal.App.4th 921, 925 (*Matye*).)

Viewing the evidence presented by the People in their case-in-chief in the light most favorable to the trial court's decision, we conclude there is substantial evidence that defendant reasonably should have known J.S. had physical or mental limitations that restricted his ability to carry out normal activities or protect his rights. The audio recording of J.S.'s encounter with defendant and Binford showed J.S. made sounds that were verbal tics or related to Tourette's Syndrome. Officer Hernandez testified J.S. exhibited verbal tics. The officer believed J.S. had some sort of disability. J.S. testified his leg had been twitching during the encounter with the security guards. On the recording, J.S. asked if the guard saw J.S.'s leg. J.S. repeatedly told the guards he was having a focal seizure and would have an epileptic seizure if he did not cool down. J.S. testified he had an epileptic seizure when the guards grabbed him. The trial court was able to observe J.S. on a body camera video and at trial, and it found J.S. credible.

(*Matye, supra*, 158 Cal.App.4th at p. 925 [considering the trier of fact's ability to personally observe a person in determining whether the person was a dependent adult].) On this record, the trial judge could have reasonably found beyond a reasonable doubt that defendant should have known from J.S.'s conduct and statements that J.S. had physical or mental limitations that limited his ability to carry out normal activities or protect his rights. Sufficient evidence supports the dependent adult abuse conviction.

II

In addition, defendant contends there is insufficient evidence to support the conviction for assault by means of force likely to produce great bodily injury. He argues we should modify the conviction from felony assault to simple assault and remand for resentencing. Our standard of review for a sufficiency of the evidence challenge is the same as for a challenge to the denial of a motion for judgment of acquittal. (*Zamudio, supra*, 43 Cal.4th at pp. 357, 360, fn. 17; *People v. Leonard* (2014) 228 Cal.App.4th 465, 485-486.)

Section 245, subdivision (a)(4) proscribes "assault upon the person of another by any means of force likely to produce great bodily injury." " '[L]ikely' means more than 'a mere possibility.' [Citation.] Great bodily injury 'means a significant or substantial physical injury.' [Citation.] Significant or substantial injury is more than a moderate harm." (*People v. Medellin* (2020) 45 Cal.App.5th 519, 527-528 (*Medellin*).) Whether the defendant used force likely to produce great bodily injury turns on the force actually used and not the force that could have been used. (*Id.* at p. 527.) The use of hands or fists alone may support a section 245, subdivision (a)(4) conviction. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028; *People v. Tallman* (1945) 27 Cal.2d 209, 212.) When a section 245, subdivision (a) charge is based on the use of hands or fists, we look at the force of the impact, the manner in which it was used, and the circumstances under which the force was applied to determine whether the force used would be likely to cause great bodily injury. (*Medellin,* at p. 528.)

9

J.S. testified that defendant and Binford punched and kicked him. He said a guard hit him hard in the face with a closed-fist punch. On the recording, J.S. is heard saying, "Ow. You punched me." He can then be heard groaning and making sounds of pain. Defendant concedes in his appellate opening brief that J.S.'s testimony supported a finding that defendant struck J.S. in the face with a closed fist. J.S. testified he could not do anything because he was having a seizure. (See *Medellin, supra*, 45 Cal.App.5th at p. 528 [stating that the victim was unaware the defendant was going to punch him, increasing the likelihood it would result in great bodily injury].) Defendant denied punching J.S., testifying that he only forcefully placed his open palm on J.S.'s jaw and moved J.S.'s face. But toward the end of the audio recording, J.S. again said one of the guards had punched him. Binford referenced J.S. getting punched in the face and noted that J.S. had blood in his mouth.

J.S. identified the portions of the audio recording where the guards kicked and punched him as his wristband was cut off. (*People v. Roberts* (1981) 114 Cal.App.3d 960, 965 [stating that kicking a defenseless man on the ground was unmistakably an assault likely to produce great bodily harm].) Defendant admitted he removed J.S.'s wristband. J.S. testified he was "black and blue" after the incident, had a hematoma on his head and over 150 to 200 cuts and scrapes all over his body, and suffered neck and back injuries. (*Medellin, supra*, 45 Cal.App.5th at p. 528 [considering the extent of the victim's injuries in determining whether the section 245, subdivision (a)(4) charges were sufficiently proven]; *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1086 ["if injuries result, the extent of such injuries and their location are relevant facts for consideration" in deciding a section 245, subdivision (a) charge].) Officer Hernandez testified that J.S. had a bump on his forehead, bruises, cuts, and scrapes. J.S. said he received physical therapy and treatment for thoracic nerve injury and needed cosmetic surgery on his forehead in relation to the injuries he received.

On this record, the trial court could have reasonably found beyond a reasonable doubt that the force defendant actually used was likely to cause J.S. great bodily injury.

DISPOSITION

The judgment is affirmed.

                                        /S/
                                  MAURO, Acting P. J.


We concur:


    /S/
KRAUSE, J.


    /S/
WISEMAN, J.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.