[No. S068230. Dec. 10, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND OSCAR BUTLER, Defendant and Appellant.

COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointments by the Supreme Court, Jay Colangelo, Assistant State Public Defender, Jessica K. McGuire and Caroline Lange, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon and Jason C. Tran, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORRIGAN, J.**—This is the second death penalty appeal brought by defendant Raymond Oscar Butler. In *People v. Butler* (2009) 46 Cal.4th 847 [95 Cal.Rptr.3d 376, 209 P.3d 596] (*Butler I*), we affirmed the conviction and sentence of death imposed on defendant for murdering two college students. In this case, he was convicted of first degree murder and sentenced to death for stabbing a fellow jail inmate. (Pen. Code, §§ 187, subd. (a) & 190.2, subd. (a)(2).) Defendant contends he was denied his Sixth Amendment right to represent himself at trial. (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).) We agree. The trial court erroneously decided that defendant could not adequately represent himself because of jail restrictions resulting from his disciplinary infractions. *Faretta* and its progeny require reversal of the judgment in its entirety.

## I. BACKGROUND

The jailhouse murder occurred on March 26, 1995, while defendant was awaiting trial for the *Butler I* murders. We need not detail the circumstances of the stabbing; they were introduced at the penalty phase in *Butler I* and are set out in 46 Cal.4th at pages 852–853. Here, we discuss only the facts relevant to defendant's *Faretta* claim.

Defendant was represented by counsel in *Butler I*. In the present case, however, he sought to represent himself early on, before special circumstance allegations were added to the complaint. In December 1995, defendant filed a handwritten *Faretta* motion asserting his "unconditional constitutional right to represent himself without counsel." Defense counsel filed a supporting declaration, explaining that he was defendant's attorney in *Butler I* and had agreed with the county to represent him in this second prosecution for no additional fee. Because the jail stabbing would be the primary evidence at a penalty phase in *Butler I*, counsel would be preparing to address the incident. He was willing to serve as advisory or standby counsel, and could take over the defense should defendant not continue in propria persona (hereafter, "pro. per.").

The prosecutor responded that defendant might be seeking self-representation to gain pro. per. jail privileges, or for purposes of manipulation and delay. However, she added that "[w]hatever the defendant's reasons for requesting pro per status, an otherwise appropriate request to proceed in propria persona must be granted." The trial court granted defendant's motion on December 12, 1995.

On January 2, 1996, the county filed a motion to restrict defendant's "in custody pro per privileges." County counsel claimed that defendant was a demonstrated security risk, with a long and escalating record of disciplinary infractions: In April 1994, he was insubordinate and disrespectful toward a deputy who was escorting him to his cell. In May 1994, he was found with a razor blade modified for use as a weapon. In August 1994, he possessed an unauthorized amount of cash. In September 1994, he tried to prevent his cell door from locking, was found with contraband razor blades, was insubordinate to staff, and caused a disturbance. In March 1995, he participated in the stabbing for which he was currently being prosecuted. In December 1995, he was again found with razor blades, along with contraband cigarettes and a lighter.

County counsel explained that inmates in administrative segregation were allowed to use the "Pro Per Law Library" in compatible, multiracial groups to "prevent[] one group from establishing a power base" in the library. Defendant's actions showed he was a threat to other inmates and a potential victim

of retaliation for the stabbing incident. The sheriff opposed giving him access to the law library, which would bring him into contact with other inmates and staff. The sheriff was, however, willing to provide legal forms and supplies, to staple documents, and to approve a legal runner subject to security checks.

At a hearing on January 3, 1996, defendant objected that he had no books and no opportunity to prepare a response to the county's motion. He was also concerned about his telephone access. County counsel told the court that no additional telephone privileges were granted to pro. per. inmates. The court agreed to deny defendant access to the law library, but set a hearing for February 1, 1996, regarding other restrictions on his pro. per. privileges. On that date defendant filed written opposition, arguing that terminating his privileges "would stop progress and ultimately cause a[n] undue consumption of the court's time and effort." He claimed the violations cited by the sheriff were frivolous and did not justify the restriction of his privileges under *Wilson v. Superior Court* (1978) 21 Cal.3d 816 [148 Cal.Rptr. 30, 582 P.2d 117]. Defendant said the only major infraction was the homicide, with respect to which he intended to show that his actions, "if any at all were minor."

At the hearing, defendant complained that he was being treated differently from other pro. per. inmates with similar disciplinary records. He claimed the county's concern that he might be a victim of retaliation was speculative, and said he needed access to the library "because I do plan on representing myself all the way to the end in this case." County counsel denied that defendant had been singled out, and contended that taking him to and from the library and allowing him to be with other inmates in the library posed a "major security concern." The court granted the motion to restrict defendant's privileges and denied his request for expanded telephone access. It noted that he had a legal runner and advisory counsel.

On July 30, 1996, the prosecutor informed the court that defendant had been sentenced to death in *Butler I.* The court granted her motion to amend the complaint to include the murder convictions in that case as special circumstances. Defendant's advisory counsel reported that his client was being denied "all pro per privileges of any kind whatsoever," and had been told by the deputies in jail that "he is no longer pro per." Counsel requested and received a minute order confirming defendant's pro. per. status.

On October 29, 1996, defendant appeared for a hearing before a new judge, who handled the remaining pretrial proceedings and the trial itself. Defendant complained that he was "receiving no pro per privileges at all." At the next hearing, on November 15, the court itself raised the subject of defendant's self-representation, warning defendant and a codefendant who was also representing himself that "I want to resolve this [*Faretta*] issue . . . .

You guys are common-sense people, you have been around. It is pretty obvious with this type of situation that pro per status is probably going to be revoked. It makes sense to me, it makes sense to you."

The court took up the matter on December 10, 1996, telling defendant, "This is nothing personal, Mr. Butler. Understand? You have always treated me with respect. But I have a great concern, based on the fact you already have a sentence of death and this case is predicated, I believe, on the allegation that a person in custody was shanked . . . . That, in itself, puts the court in concern not only for your safety and retaliation, but concern for other prisoners and deputies. Does that make sense to you?" Defendant said yes, but also affirmed that he wanted to keep representing himself.

The court asked to hear from the prosecutor about other incidents involving defendant. The prosecutor reported the following infractions in addition to those outlined in the county's January 1996 motion: In October 1995, defendant was found with razor blades yet again. In February 1996, he "slipped his cuffs and assaulted an inmate in line." In June 1996, he was found with tar heroin. In October 1996, he and another inmate were discovered "making drugs," and he also had a large container of jail-made alcohol. Most significantly, in October 1996, as he was preparing to come to court, a jail deputy saw him insert something into his rectum, which turned out to be a four-inch-long piece of sharpened metal known in jail vernacular as a "shank" or "shiv." The prosecutor had reports on these incidents, but had not yet provided them to the court. Defendant insisted that "most of [these reports] are not true." When questioned by the court, he said he knew of no one seeking retaliation against him. He denied being in a gang since he had been in custody, but admitted he had been in one previously.

The prosecutor argued that defendant was particularly dangerous because he had been sentenced to death, and "basically . . . has nothing to lose." She summarized the alleged facts of the jail stabbing. Defendant, his two codefendants, and the victim were being taken to the showers. One codefendant emerged from his cell unhandcuffed, and unlocked defendant's cuffs. He and defendant then took turns stabbing the victim in the chest with a shank. The other codefendant remained handcuffed, but assisted by preventing the victim's escape. The prosecutor called a deputy to the stand, who verified defendant's disciplinary reports and said he was a "very high security risk inmate" based on his continuing infractions in jail and the death sentence he had already suffered. He could not be allowed in the law library. The 20 to 25 high-security inmates then representing themselves were assigned to compatible groups for trips to the law library. However, inmates like defendant posed too severe a risk to be placed in any group.

The court observed that defendant had "always been courteous to this court," and asked about the witness's experience with defendant. The deputy said he had only limited contact with defendant, but that defendant's record spoke for itself. Defendant declined to respond to the prosecutor's showing. The court made the following observations and ruling: "Mr. Butler, the court asked for the hearing based on the charge here. As I said, you treat us with respect. I think it's inappropriate for this court to allow you to remain in pro per status based on at least ten incidents, most of them involving some type of violence or a weapon in the jail. The most current is where you had a shiv in your rectum. The case that you [have] pending now is a case . . . regarding a fellow inmate with the allegation that you and two other persons were involved in the death by shanking, and the fact [that] you have been found guilty and [are] facing a capital death sentence . . . . Would you agree that some of those are pretty egregious? I think for your benefit and the safety of the deputies that I will revoke the pro per status from you. Do you understand?" Defendant said, "Yes, your honor." The court added, "Okay. This is, I think, a good precaution for everybody and to protect you as well."

The court then heard defendant's motion to replace his counsel. (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) Defendant claimed that counsel, while serving in his advisory status, had failed to confer with him or otherwise assist in preparing a defense. The court denied the motion and reappointed counsel.

The next hearing was six weeks later, in January 1997. The prosecutor told the court she was concerned that defendant had not been given notice of the new incident reports she introduced at the hearing in December. She asked that he be given the opportunity to revisit the revocation of his pro. per. status and contest that evidence. The court said, "I have no objection. Mr. Butler and I have spoken before on the record here. I have nothing against you at all. You have a competent lawyer. You have been given the death penalty; it is on appeal. To proceed on a death penalty case without counsel to me just doesn't make sense. The court had a full hearing. What she is saying is you probably didn't have proper notice. . . . If you want to revisit that and bring some witnesses in, I will do that for you. But I think you have a competent lawyer. It is up to you to make a decision."

Defendant said he "would like to be able to bring witnesses in and dispute that." A hearing was held on April 9, 1997. Acting as his own counsel, defendant called a witness but then hesitated to ask questions that might incriminate himself. The court told him that was always a danger of self-representation, and that questioning witnesses was particularly risky in cases with multiple defendants, like this one. Ultimately, after consulting with his advisory counsel, defendant decided to ask no questions and submitted the

matter for a ruling. The court said, "for the record, Mr. Butler, . . . all of the defendants have been straight with this court. I have not had any problems with any of you. It wasn't based on anything you have done in my court with my bailiffs." However, defendant's misconduct in jail put "the court staff, the other defendants and yourself in some form of jeopardy." Noting the absence of any new evidence, the court reaffirmed the revocation of defendant's pro. per. status.

Defendant filed a renewed *Faretta* motion on September 16, 1997. At a hearing on September 22, he adamantly asserted his right to self-representation, telling the court, "it is my constitutional right and I would like to invoke it. I mean I feel I can put more time and effort into it than [counsel]." The court told him, "Here is the problem: the sheriff has the absolute right to shut down any pro per privileges that you have in jail. Understand? Based on your record of incidents, that is what will happen, I am sure. They will not let you go anywhere, so you will be restricted [to] going from the jail to here. While you are here, even if you are in pro per, we will use the react belt plus we will use probably some other things. You can't walk around the courtroom; you won't be able to move. I don't know what privileges, if any, you will have at the county jail. Understand?" Defendant replied in the affirmative. When pressed by the court as to how he could be better prepared than his lawyer, he said, "I've got 24 hours a day, seven days a week, to work on this case."

Defendant was unswayed by the court's repeated warnings about the restrictions on his ability to prepare a defense. He claimed he could work in his cell, and said "we will have to work something out" to get him the resources he would need. The court acknowledged that defendant had the right to represent himself, but said, "I also have another obligation to see whether or not you have a fair trial. If you are in pro per and you have no access to the law library, you can't interview anybody, then you go right [from] there to here, how do you think you will be prepared?" Defendant said, "I have never once broke any of the policies as a pro per, so I don't know why I would be . . . under the disadvantage of not going to the law library as the other pro pers." The court again told defendant that the sheriff was not going to give him the privileges he wanted. The court said, "I am not concerned about the courtroom because we can handle you in the courtroom," but asked defendant to think about the effect his limited preparation would have on the jurors who would hear the evidence "without an adequate lawyer." Defendant replied, "I understand, your honor, but I still feel that I can represent myself in this trial."

Defendant then requested "all items of discovery." The court warned him that it would not grant a continuance, and that he would have to be ready for

trial in about a month, on October 20. Defendant said he understood, but told the court, "I am only asking the same as any attorney would have, to have all items of discovery." The court reiterated that "they may not give you any privileges" in jail. Defendant replied, "I understand, your honor, but I have a constitutional right and I would like to . . . go pro per." The court acquiesced, granting the *Faretta* motion. Defense counsel said he had "boxes and boxes of stuff." The court observed that the names of witnesses would have to be redacted before the material was turned over to defendant.[1] Counsel agreed to contact the sheriff to learn how they would handle the discovery material.

On October 20, defendant informed the court that he had not yet received his discovery items. The court asked counsel if he was "ready to go," and counsel said yes. The court asked defendant, "would you like to have this lawyer back? It is up to you." Defendant responded, "I don't understand the question." When the court repeated it, defendant said, "so there is no way that I can get the items I need for trial?" The court replied, "you can't be ready for trial. When you went pro per, that is part of the situation where you have to be ready to go. What are you missing that you didn't get?" Defendant said he only had the material from the guilt phase of the *Butler I* trial.

Defense counsel disputed this. He claimed that defendant had all the material relating to the jail stabbing, which was part of the *Butler I* penalty phase. However, counsel also reported that the jail had told him "they couldn't give [defendant] all the materials at one time, but that we could rotate stuff through." Counsel further acknowledged that he still had "many, many cardboard boxes and thousands and thousands of pages of stuff which I'm redacting page by page." Counsel did not describe the nature of the material he had yet to turn over. Without further inquiry, the court revoked defendant's *Faretta* right for the second time, with this statement: "It is not unique to your client. This is the pro per problem. You have a pro per that is in for another case; and the jail is a jail, it is not a law library. They restrict what you can do there. That is why it just doesn't make sense to do that. In any event, I will just put you back on the case. You have had some time to work on at least the guilt phase. You can take a look at that and if we need to . . . we will take a short delay to look at the penalty phase. We will not be starting that right away."

Jury selection began a week later, on October 27, 1997. A jury was empanelled on November 4, and trial started the following day. Defendant

---

[1] "If the defendant is acting as his or her own attorney, the court shall endeavor to protect the address and telephone number of a victim or witness by providing for contact only through a private investigator licensed by the Department of Consumer Affairs and appointed by the court or by imposing other reasonable restrictions, absent a showing of good cause as determined by the court." (Pen. Code, § 1054.2, subd. (b).)

made no further *Faretta* motion. The jury found him guilty of murder and returned a verdict of death.

## II. DISCUSSION

■ In *Faretta*, the United States Supreme Court declared that a defendant "must be free personally to decide whether in his particular case counsel is to his advantage," even though "he may conduct his own defense ultimately to his own detriment . . . ." (*Faretta, supra,* 422 U.S. at p. 834.) "The Sixth Amendment . . . implies a right of self-representation." (*Id.* at p. 821.) Thus, a state may not "constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense." (*Id.* at p. 807.)

■ The tension between the right of self-representation and the interest in ensuring a fair trial was a matter of dispute in *Faretta* itself, and it persists to this day.[2] The rule announced by the *Faretta* majority, however, remains the law of the land. (See *Edwards, supra,* 554 U.S. at p. ___ [128 S.Ct. at p. 2388].) This court, of course, may not adopt an alternative view of what the Sixth Amendment requires. (See *People v. Blair, supra,* 36 Cal.4th at p. 740; *People v. Dent, supra,* 30 Cal.4th at pp. 224–225 (conc. opn. of Chin, J.).)

■ "When 'a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be. Furthermore, the defendant's "technical legal knowledge" is irrelevant to the court's assessment of the defendant's knowing exercise of the right to defend himself.' (*People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187] . . . , quoting *Faretta, supra,* 422 U.S. at p. 836 [95 S.Ct. 2525].) Erroneous denial of a *Faretta* motion is reversible per se. (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 177, fn. 8 [79 L.Ed.2d 122, 104 S.Ct. 944].)" (*People v. Dent, supra,* 30 Cal.4th at

---

[2] See *Faretta, supra,* 422 U.S. at pages 839–840 (dis. opn. of Burger, J.); *id.* at page 849 (dis. opn. of Blackmun, J.); *Indiana v. Edwards* (2008) 554 U.S. 164 [171 L.Ed.2d 345, 128 S.Ct. 2379, 2389] (dis. opn. of Scalia, J.) (*Edwards*); *Martinez v. Court of Appeal of Cal.* (2000) 528 U.S. 152, 161 [145 L.Ed.2d 597, 120 S.Ct. 684]; *People v. Blair* (2005) 36 Cal.4th 686, 739–740 [31 Cal.Rptr.3d 485, 115 P.3d 1145]; *People v. Dent* (2003) 30 Cal.4th 213, 222–225 [132 Cal.Rptr.2d 527, 65 P.3d 1286] (conc. opn. of Chin, J.); *U.S. v. Farhad* (9th Cir. 1999) 190 F.3d 1097, 1105–1109 (conc. opn. of Reinhardt, J.); Decker, *The Sixth Amendment Right to Shoot Oneself in the Foot: An Assessment of the Guarantee of Self-Representation Twenty Years After* Faretta (1996) 6 Seton Hall Const. L.J. 483; but see Hashimoto, *Defending the Right of Self-Representation: An Empirical Look at the Pro Se Felony Defendant* (2007) 85 N.C. L.Rev. 423.

p. 217.) The same standard applies to erroneous revocation of pro. per. status. (*People v. Carson* (2005) 35 Cal.4th 1, 11, fn. 1 [23 Cal.Rptr.3d 482, 104 P.3d 837].)

 There are limits on the right to act as one's own attorney. As the high court recently observed, "*Faretta* itself and later cases have made clear that the right of self-representation is not absolute." (*Edwards, supra,* 554 U.S. at p. ___ [128 S.Ct. at p. 2384].) The *Faretta* court noted that "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." (*Faretta, supra,* 422 U.S. at p. 834, fn. 46; see also *People v. Carson, supra,* 35 Cal.4th at pp. 8–9.) It is settled that the *Faretta* right may be waived by failure to make a timely request to act as one's own counsel (*People v. Windham, supra,* 19 Cal.3d at pp. 128–129), or by abandonment and acquiescence in representation by counsel (*People v. Stanley* (2006) 39 Cal.4th 913, 929 [47 Cal.Rptr.3d 420, 140 P.3d 736]; *People v. Dunkle* (2005) 36 Cal.4th 861, 909–910 [32 Cal.Rptr.3d 23, 116 P.3d 494]). The court may deny a request for self-representation that is equivocal, made in passing anger or frustration, or intended to delay or disrupt the proceedings. (*People v. Marshall* (1997) 15 Cal.4th 1, 23 [61 Cal.Rptr.2d 84, 931 P.2d 262].) A defendant may be mentally incompetent to waive counsel. (*Godinez v. Moran* (1993) 509 U.S. 389, 400–401 [125 L.Ed.2d 321, 113 S.Ct. 2680].) And in *Edwards,* the high court recently decided that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* [*v. United States* (1960) 362 U.S. 402 [4 L.Ed.2d 824, 80 S.Ct. 788]] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Edwards, supra,* 554 U.S. at p. ___ [128 S.Ct. at p. 2388].)

None of these circumstances, with the possible exception of obstructive misconduct, was present in this case. Defendant timely, unequivocally, and persistently invoked his *Faretta* right.[3] The court expressed no concern that he was attempting to delay or disrupt the proceedings. No question arose at any point as to his mental competence to waive counsel or present a defense. The court did refer to defendant's misconduct in custody when it initially

---

[3] The Attorney General contends defendant waived his claim of error by acquiescing in the court's revocation of his self-representation in December 1996, and abandoning the effort to defend his *Faretta* right in April 1997. We disagree. Defendant said he understood the court's ruling in December, but he did not accept it. As the Attorney General recognizes, defendant was not required to renew his request after it was conclusively denied. (*People v. Dent, supra,* 30 Cal.4th at p. 219.) When the prosecutor reopened the issue, conceding defendant had no notice of the disciplinary infractions she presented in December, defendant immediately sought to contest the matter. Although he ultimately decided not to question his witness at the hearing in April, he continued to assert his right of self-representation. The following September, he filed another *Faretta* motion. No waiver or abandonment can be gleaned from this record.

revoked his self-representation. At the time of the proceedings below, however, this was not a valid basis for the court's action. In *Ferrel v. Superior Court* (1978) 20 Cal.3d 888 [144 Cal.Rptr. 610, 576 P.2d 93] (*Ferrel*), this court held that only disruptive *in-court* misconduct would justify terminating a defendant's pro. per. status. (*Id.* at p. 891.)

■ We have since renounced that rule, deciding that it unduly restricted trial courts' authority to respond to misconduct occurring outside the courtroom. (*People v. Carson, supra*, 35 Cal.4th at p. 8.) In *Carson*, we held that "serious and obstructionist out-of-court misconduct" that threatens to "subvert 'the core concept of a trial' [citation] or to compromise the court's ability to conduct a fair trial [citation]" may lead to forfeiture of the right to self-representation. (*Id.* at p. 10.)[4]

Here, defendant committed many disciplinary infractions in jail. Some were minor but a number of them were quite troubling, even aside from the jailhouse stabbing for which he was being prosecuted. He was repeatedly discovered with weapons. On one occasion, he concealed a shank in his rectum just before he was to be taken to the courtroom. The court had ample reason to be reluctant about defendant's self-representation. We agree with the dissent that defendant was an obvious security risk, and safety precautions were justified both in the jail and the courtroom. However, there was no showing that his pro. per. status increased the risk in any way. Self-represented or not, defendant was going to be housed in the jail, transported to and from court, and in attendance for his trial.

In any event, we need not and do not decide whether defendant's out-of-court misconduct might have justified the revocation of his *Faretta* right, because ultimately the court did not rely on that ground. Indeed, it permitted defendant to resume representing himself shortly before trial, telling him that it was "not concerned about the courtroom because we can handle you in the courtroom," and that he would be restrained from moving around freely whether or not he was acting as his own counsel.[5] The court made no

---

[4] In *Carson*, the defendant's investigator mistakenly gave him discovery material to which he was not entitled, including witness addresses and telephone numbers, and criminal history records. (*People v. Carson, supra*, 35 Cal.4th at p. 12.) In light of the defendant's "antecedent attempts to suborn perjury, fabricate an alibi, and possibly intimidate a prosecution witness," the trial court terminated his *Faretta* right. (*Id.* at p. 13.) This court emphasized the necessity of developing an adequate record of the basis for terminating a defendant's self-representation when out-of-court misconduct is involved. (*Id.* at p. 11.) Because the record in *Carson* did not sufficiently reflect the actual impact of the defendant's misconduct on the trial, or whether sanctions short of termination would have addressed the problem, we ordered a remand to the trial court for a hearing on those questions. (*Id.* at p. 14.)

[5] A pro. per. defendant may be physically restrained during trial for security purposes. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1042–1043 [95 Cal.Rptr.2d 377, 997 P.2d 1044];

reference to defendant's misconduct in jail, except to remind him that because of his record the sheriff was unlikely to allow him to exercise the privileges ordinarily available to pro. per. inmates.

After less than a month, the court terminated defendant's self-representation once again. This time, the revocation was based on the limitations imposed on his ability to prepare for trial. The court observed that the situation was not unique, but was "the pro per problem." It declared that pro. per. representation "just doesn't make sense" when "[t]hey restrict what you can do" in jail.

■ The court erred in this instance. In *Ferrel,* the Attorney General argued that "termination of a defendant's pro. per. status would . . . be justified when, by defendant's own misconduct in jail, he loses his pro. per. privileges, thereby making it practically impossible for him to prepare a defense." (*Ferrel, supra,* 20 Cal.3d at p. 892.) The *Ferrel* court disagreed, observing that while limitations on pro. per. privileges "may be necessary . . . as a result of a defendant's misconduct in jail," they "would not, however, preclude a defendant from making an intelligent and voluntary decision to continue to represent himself provided that he has been warned of the dangers and difficulties that such a choice might entail." (*Ibid.*)

■ *Ferrel*'s decision on this point remains undisturbed. Restrictions on pro. per. privileges in custody are not unusual. (See *Wilson v. Superior Court, supra,* 21 Cal.3d at pp. 824–826; 3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 25, pp. 63–64; *id.,* § 55, pp. 94–96.) They have never been deemed a justification for depriving inmates of the right to represent themselves. Later cases are consistent with *Ferrel*'s holding that the conditions of confinement are not a legal impediment to the exercise of *Faretta* rights. It is settled that while self-represented inmates may not be deprived of all means of preparing a defense, the Constitution does not require *personal* access to legal resources. The provision of advisory counsel and reasonably necessary investigative assistance sufficiently protects the Sixth Amendment rights of pro. per. inmates. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1040; see also *People v. Blair, supra,* 36 Cal.4th at pp. 732–733; *People v. Ringo* (2005) 134 Cal.App.4th 870, 876–877 [36 Cal.Rptr.3d 444]; *Kane v. Garcia Espitia* (2005) 546 U.S. 9, 10 [163 L.Ed.2d 10, 126 S.Ct. 407]; *Lewis v. Casey* (1996) 518 U.S. 343, 350–351 [135 L.Ed.2d 606, 116 S.Ct. 2174].) Therefore, contrary to the trial court's view in this case, inmates still have the right to represent themselves even when their ability to prepare is restricted in custody.

*People v. Superior Court (George)* (1994) 24 Cal.App.4th 350, 355 [29 Cal.Rptr.2d 305].) Defendant and his codefendants wore stun belts during the trial.

■ Here, defendant had advisory counsel and was being given discovery materials.[6] The record reflects no request for an investigator during the weeks before trial. Thus, it appears defendant had adequate resources to conduct his own defense. To the extent the trial court based its decision on his inability to martial those resources in his own defense, it was mistaken. The court's conclusion that "it just doesn't make sense" to allow pro. per. representation under the circumstances faced by defendant may have been reasonable, but it was inconsistent with the requirements of *Faretta* and its progeny.

■ It is established that the *effectiveness* of a self-represented defendant's preparation is ordinarily irrelevant.[7] Defendants untrained in the law may well provide themselves with inept representation. But *Faretta* gives them the right to make a thoroughly disadvantageous decision to act as their own counsel, so long as they are fully advised and cognizant of the risks and consequences of their choice. (*Faretta*, *supra*, 422 U.S. at pp. 835–836; *Godinez v. Moran*, *supra*, 509 U.S. at pp. 399–400; *People v. Blair*, *supra*, 36 Cal.4th at pp. 739–740; *People v. Koontz* (2002) 27 Cal.4th 1041, 1069–1070 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Welch* (1999) 20 Cal.4th 701, 733–734 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Those risks may include custodial limitations on the ability to prepare a defense in jail. (*Ferrel*, *supra*, 20 Cal.3d at p. 892.) Here, defendant was repeatedly and thoroughly admonished on that score, and made his decision despite the restrictions imposed on him.

Defendant claims the court erred by failing to grant him a continuance so that he could complete his preparations for trial. We do not reach this issue. Defendant did not ask for a continuance, though this may have been because the court admonished him that none would be granted. Indeed, the court never considered the grounds for a continuance because of its view that defendant simply could not be prepared under the conditions of his confinement. (See *People v. Jenkins*, *supra*, 22 Cal.4th at p. 1039 [grounds for continuance must be found in particular circumstances and reasons presented to trial court].)[8] As we have explained, that determination afforded no ground for revoking defendant's pro. per. status.

---

[6] The record indicates that counsel served in both "advisory" and "standby" capacities. (See *People v. Blair*, *supra*, 36 Cal.4th at p. 725; *People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14 [259 Cal.Rptr. 701, 774 P.2d 730].)

[7] Thus far, the only instance in which the United States Supreme Court has recognized that a defendant's ability to conduct a defense has any bearing on the right of self-representation is the recent decision in *Edwards*, which is limited to cases of severe mental illness. (*Edwards*, *supra*, 554 U.S. at p. ___ [128 S.Ct. at p. 2388].) We asked the parties for briefing on whether *Edwards* had any relevance to this case. Both sides agreed that it did not.

[8] We note, in any event, that the record does not support the Attorney General's claim that a continuance was unwarranted because defendant was dilatory in his preparation as the trial date approached in October 1997. Defendant's lack of preparation appears to have resulted largely from factors beyond his control. Defense counsel acknowledged that he had yet to

■ The dissent takes the position that a demonstrably dangerous defendant may be denied his Sixth Amendment right of self-representation if reasonable security measures restrict his opportunity to prepare for trial. There is no case that stands for that proposition. We decide this case under compulsion of United States Supreme Court precedent. The high court is free to refine its jurisprudence in this area. However well advised such a development might be, this court is not empowered to narrow the established scope of a federal constitutional right. Accordingly, we conclude that defendant's conviction and sentence must be reversed under the prevailing constitutional standards.

## DISPOSITION

The judgment is reversed.

George, C. J., Kennard, J., Werdegar, J., and Moreno, J., concurred.

**CHIN, J.,** Dissenting.—I dissent. The question before us is whether the Sixth Amendment requires the trial court to allow a defendant who has already *killed* a jail inmate (and clearly intends more jail violence) to represent himself, with the obvious danger to jail inmates and staff and other difficulties inherent in such self-representation. The majority holds that the trial court violated defendant's Sixth Amendment right to represent himself when it revoked his self-representation status shortly before trial. (See *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).) In my view, the trial court properly refused to let defendant represent himself under the extreme circumstances the case presents.[1]

When the trial court revoked defendant's self-representation status, in October 1997, he was already under a judgment of death in another case. He was in jail awaiting trial in this case for murdering an inmate in the same jail while awaiting trial in the previous case. The murder charge was not just an unfounded allegation, but had been supported by evidence presented in aggravation at the previous trial (see *People v. Butler* (2009) 46 Cal.4th 847, 852–853 [95 Cal.Rptr.3d 376, 209 P.3d 596]) and at the preliminary hearing

provide defendant with a substantial amount of discovery material. The documents that counsel had turned over were being given to defendant on a piecemeal basis by jail staff, and the record does not show how far that process had progressed. Furthermore, defendant's opportunity to prepare for trial had been substantially compromised by the revocation of his *Faretta* right during most of the previous year.

[1] Because the majority holds that the entire judgment must be reversed due to the denial of self-representation, my views on the other issues defendant has raised cannot affect the judgment, and I express no opinion on those issues. (See *People v. Mattson* (1984) 37 Cal.3d 85, 96 [207 Cal.Rptr. 278, 688 P.2d 887] (dis. opn. of Kaus, J.).)

in this case. That evidence showed that, on March 26, 1995, defendant and other inmates stabbed the victim to death with a metal shank in full view of a correctional officer.

Additionally, defendant had a long series of jail disciplinary charges, ranging from minor to very serious. On several occasions, some *after* he had already stabbed the inmate to death, he was found with razor blades modified for use as weapons. One time *after* the murder, defendant "slipped his cuffs and assaulted an inmate in line." Another time, again *after* he had stabbed the inmate to death with a shank, he was caught concealing a four-inch shank in his rectum.

Defendant was an obvious and extreme jail security risk. He had killed one inmate, clearly intended more violence and, because he was already under a judgment of death, may have believed he had nothing to lose in perpetrating further violence. The sheriff, charged with protecting the inmates entrusted to his keeping, was understandably concerned about giving defendant self-representation privileges. Human lives were at stake. The sheriff had a duty to do all he reasonably could to ensure defendant had no opportunity to kill again.

Under the circumstances, the sheriff could reasonably protect inmates and jail staff only by denying defendant access to the law library and imposing other security restrictions that would prevent him from adequately preparing his case and competently acting as his own counsel. There were also obvious problems with discovery, as the proceedings before trial attest. How could defendant, with his history, be personally entrusted with sensitive discovery materials from within the jail system?

The majority insists that, even under these circumstances, the Sixth Amendment forced the trial court to permit defendant to represent himself. I disagree. The right of self-representation is not absolute. When, as here, defendant's *own actions* made it difficult, if not virtually impossible, for him to effectively represent himself, the trial court, consistent with protecting human lives, may deny self-representation. Two decisions, one from this court and one from the high court, neither directly on point but both highly instructive, make this clear. Together, the two cases present intersecting theories supporting the denial of self-representation.

The first case is *Indiana v. Edwards* (2008) 554 U.S. 164 [171 L.Ed.2d 345, 128 S.Ct. 2379] (*Edwards*). In *Edwards*, the Indiana Supreme Court had concluded the trial court erred in denying self-representation to a defendant who, although competent to go to trial, was not mentally competent to represent himself. It had believed that *Faretta, supra,* 422 U.S. 806, and

*Godinez v. Moran* (1993) 509 U.S. 389 [125 L.Ed.2d 321, 113 S.Ct. 2680] required the state to allow the defendant to represent himself even under those circumstances. (*Edwards, supra,* 554 U.S. at p. ___ [128 S.Ct. at p. 2383].) The high court reversed the Indiana Supreme Court and held the state properly denied self-representation. The court explained, "*Faretta* does not answer the question before us both because it did not consider the problem of mental competency [citation], and because *Faretta* itself and later cases have made clear that the right of self-representation is not absolute." (*Id.* at p. ___ [128 S.Ct. at p. 2384].)

*Edwards* "concern[ed] a mental-illness-related limitation on the scope of the self-representation right." (*Edwards, supra,* 554 U.S. at p. ___ [128 S.Ct. at p. 2384].) The court concluded that a trial court may deny self-representation to a defendant who is "not mentally competent to conduct [the] trial himself." (*Id.* at p. ___ [128 S.Ct. at p. 2381].) *Edwards* is not directly on point. The trial court here did not deny self-representation because of defendant's mental state, but because of his violent behavior in jail. But the reasons *Edwards* gave for permitting the court to deny self-representation apply here. "[A] right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel." (*Edwards, supra,* at p. ___ [128 S.Ct. at p. 2387].) Here, we should be similarly unconcerned with affirming the dignity of a defendant who is already under a sentence of death, and who is personally responsible for the actions that made him such a security risk that he could not effectively defend himself. The specter of a defendant trying to defend himself while incarcerated under severe restrictions that make it impossible for him to capably do so is hardly consistent with affirming that defendant's dignity.

"Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context under-cuts the most basic of the Constitution's criminal law objectives, providing a fair trial." (*Edwards, supra,* 554 U.S. at p. ___ [128 S.Ct. at p. 2387].) " '[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.' " (*Ibid.*) Accordingly, "the Constitution permits judges to take *realistic* account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." (*Id.* at pp. ___–___ [128 S.Ct. at pp. 2387–2388], italics added.) Similarly, the Constitution permits judges to take realistic account of the particular defendant's history of jail misconduct, which makes it effectively impossible for him to capably defend himself, consistent with protecting the lives of inmates and staff.

The second case that supports the trial court's denial of self-representation is our own decision in *People v. Carson* (2005) 35 Cal.4th 1 [23 Cal.Rptr.3d 482, 104 P.3d 837] (*Carson*). In *Carson*, the trial court revoked the defendant's right of self-representation due to his out-of-court misconduct, possibly including witness intimidation, that threatened to obstruct the trial proceedings. We explained that *Faretta, supra,* 422 U.S. 806, "understandably contains scant reference to the circumstances that would justify termination of the right of self-representation." (*Carson, supra,* at p. 8.) We extended the grounds for denying self-representation to out-of-court misconduct "that seriously threatens the core integrity of the trial." (*Id.* at p. 6.) We also said that "we do not suggest witness intimidation is the only type of serious and obstructionist out-of-court misconduct that may warrant termination of self-representation." (*Id.* at p. 10.) Thus, *Carson* establishes that, under certain circumstances, the defendant can, by his own actions, effectively forfeit the right of self-representation.

The majority is correct that *Carson* is not directly on point. The trial court here did not deny self-representation because of *courtroom* security concerns. Indeed, it acknowledged that defendant had behaved himself in the courtroom. But it certainly denied self-representation due to *jail* security concerns. Jail security concerns dominated the entire course of the litigation involving defendant's representation, beginning with county counsel's first appearance representing the sheriff and expressing the sheriff's concerns. Beyond question, a court must ensure courtroom security, and fulfilling this duty may justify the denial of self-representation. But the court must *also* be sensitive to jail security. The need to protect the lives of jail inmates and staff from a defendant's murderous conduct may also justify the denial of self-representation.

The necessary limitations on defendant's self-representation, which he alone caused, would have threatened the core integrity of the trial. The high court in *Edwards* concluded that the Sixth Amendment permits a court to deny self-representation to a defendant who, *through no fault of his own,* lacks the ability to capably represent himself. Similarly, the Sixth Amendment also permits a court to deny self-representation to a defendant whose *own actions* make it realistically impossible for him to capably represent himself.

It might be possible, I suppose, for the sheriff and court to work out arrangements that could permit defendant to defend himself at least to some extent—for example, by supplying defendant with his own law library or perhaps his own computer and Internet connection in his jail cell, combined with other measures. I am sure the same was true in *Carson, supra,* 35 Cal.4th 1. But such arrangements would, no doubt, be extraordinarily difficult and expensive and still entail considerable risk. Jail resources are limited, and any

extraordinary expenditure of resources on defendant would mean reduced resources available for other inmates, including those who behave themselves. Defendant's history of jail violence made his competent self-representation incompatible with jail security or the reasonable expenditure of jail and judicial resources. As was the case in *Carson*, the Sixth Amendment does not require courts to adopt extraordinary measures to shield defendants from the consequences of their own actions.

The majority argues convincingly that the trial court could have *permitted* defendant to represent himself. (Maj. opn., *ante*, at p. 827.)[2] Assuming adequate admonitions and a knowing waiver, I do not doubt the court would not have erred in any way defendant could have complained of had it permitted him to represent himself, even with all of the restrictions that self-representation would have required under the circumstances. However, the question is not whether the court erred in *permitting* self-representation, but whether it erred *denying* it. As the high court stressed, holding that a court may permit a defendant to represent himself "simply does not tell a State whether it may *deny* a gray-area defendant the right to represent himself—the matter at issue here." (*Edwards*, *supra*, 554 U.S. at p. ___ [128 S.Ct. at p. 2385].) The majority never confronts this question. It simply leaps from the conclusion that defendant could have been permitted to represent himself to the non sequitur that "[t]herefore, contrary to the trial court's view in this case, inmates still have the right to represent themselves even when their ability to prepare is restricted in custody." (Maj. opn., *ante*, at p. 827.)

The majority states that the trial "court's conclusion that 'it just doesn't make sense' to allow pro. per. representation under the circumstances faced by defendant may have been reasonable, but it was inconsistent with the requirements of *Faretta* and its progeny." (Maj. opn., *ante*, at p. 828.) Reasonable the court's conclusion certainly was. But under the teachings of *Edwards*, *supra*, 554 U.S. 164 [128 S.Ct. 2379], and *Carson*, 35 Cal.4th 1, it was also fully consistent with Sixth Amendment requirements.

---

[2] However, the majority's description of what it claims is "settled" law (maj. opn., *ante*, at p. 827) oversimplifies a more complex question, as attested by a review of the two high court decisions the majority cites in this regard. *Kane v. Garcia Espitia* (2005) 546 U.S. 9 [163 L.Ed.2d 10, 126 S.Ct. 407] reversed a federal appellate court decision that had set aside a state criminal conviction for failure to provide a self-representing defendant with law library access. The high court stated that its jurisprudence had not clearly established a law library access right, and the federal courts were divided on the question. Thus, under federal habeas corpus law, the lower court erred in setting aside a state court conviction on that basis. The high court expressly did *not* resolve the question of whether a self-representing defendant has a right to law library access. (*Id.* at p. 10.) Thus, if anything, *Kane* suggests that the relevant law is *unsettled*, at least within the federal courts.

*Lewis v. Casey* (1996) 518 U.S. 343 [135 L.Ed.2d 606, 116 S.Ct. 2174] did not involve self-represented criminal defendants at all, but rather the rights of prison inmates to court access after they have been convicted. It has nothing whatsoever to do with this issue.

I do not suggest a trial court may deny self-representation lightly. In normal circumstances, the trial court must honor a criminal defendant's right of self-representation. But the circumstances here were far from normal. At least when a defendant awaiting trial has already killed a jail inmate and has shown that he intends further violence, the court may conclude that, by his own actions, he has forfeited his right of self-representation. The Sixth Amendment right of self-representation does not require courts to endanger human life or take heroic measures to satisfy a murderous defendant's desire to represent himself.

Baxter, J., concurred.