Filed 10/4/13  P. v. Foster CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>PARRISH D. FOSTER,<br><br>      Defendant and Appellant. | A134210<br><br>(Contra Costa County<br>Super. Ct. No. 5-110795-2) |

A jury convicted defendant Parrish D. Foster of assaulting Pak Piu Tam, assaulting a peace officer, and resisting an executive officer.  The jury also found defendant inflicted great bodily injury upon Tam when assaulting him.  Defendant, despite being "borderline competent" to stand trial, was allowed to represent himself without an attorney.  On appeal, defendant asserts the trial court should not have let him proceed in propria persona.  He also asserts substantial evidence does not support the great bodily injury finding and that his sentence is unauthorized.  We remand for resentencing, but otherwise affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Defendant's Conduct*

Ken Dea owned a multi-unit building on 23rd Street in Richmond.  The rear unit became vacant in September or October of 2010.  In November 2010, Dea learned the rear unit had become occupied without his permission.  On December 5, 2010, Dea, his wife, and her siblings—including her brother Pak Piu Tam—went to investigate.

1

When they arrived, Dea went to the rear unit. The door appeared locked from the inside, and Dea could not get in. Defendant eventually opened the door. Dea told defendant and his girlfriend, who was also inside the unit, to leave. Neither left at that time.

About 10 minutes later, however, defendant and his girlfriend exited the apartment. Defendant and Dea exchanged words. Then, defendant picked up a rock and threw it, overhand, at Tam from a distance of about one car length. The rock hit Tam in the head and Tam fell to the ground. He stopped moving. His eyes were closed, and he did not respond to his name being called.

Dea's wife called 911. Tam was taken away in an ambulance. A CT scan showed a fractured skull and cerebral hemorrhage.

Defendant, meanwhile, was arrested several blocks from where the attack occurred.

After his arrest, defendant was placed in a Contra Cost County detention facility. On March 16, 2011, defendant was about 10 minutes late for a lineup of inmates who wanted to attend a class. Defendant asked Deputy Sheriff Tholborn for permission to nonetheless attend. Tholborn told defendant he could attend the next session, but needed to return to his cell for now or face discipline. They argued for a minute or two. Defendant had clenched fists. Tholborn told defendant to desist or face discipline. After further argument, Tholborn told defendant to place his hands behind his back. Defendant did. But as Tholborn grabbed defendant's right hand, defendant turned around and flung his left fist at Tholborn, but missed. The two struggled. Defendant head butted Tholborn, Tholborn punched defendant in the face, and the struggle did not end until four deputies tased and subdued defendant. Defendant continued to resist as he was taken from the scene.

Tholborn, after his encounter with defendant, had a cut under his left eye and had bruised his tailbone from landing on his backside. He saw a doctor and worked light duty for a week after the incident.

**Court Proceedings**

The district attorney filed a felony complaint against defendant on December 8, 2010. The charges, as outlined in an amended information, were assault against Tam (Pen. Code, § 245, subd. (a)(1))[1] with an enhancement for great bodily injury (§ 12022.7, subd. (a)); assault of a peace officer (§ 245.3); and resisting an executive officer (§ 69).

At a January 13, 2011 court hearing, defendant's appointed counsel declared a doubt concerning defendant's competence to stand trial under section 1368.[2] The trial court suspended proceedings and appointed Dr. Paul Good to evaluate defendant and report on his condition.

A hearing to review Dr. Good's report occurred on March 15, 2011, but the report was not yet ready. At this hearing, defendant's counsel stated defendant wanted to represent himself. The trial court issued a further order to Dr. Good "also instructing [him] to advise the [c]ourt whether he believes Mr. Foster is capable of self representation." The trial court delayed consideration of defendant's self-representation request until in receipt of Dr. Good's report.

Dr. Good completed his report on April 7, 2011. He described defendant as a 38-year-old male with a high school and college education. He noted defendant had once before, in 2006, been declared incompetent when tried for assaulting his parents. Presently, however, Dr. Good concluded defendant was "borderline competent," stating:

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Section 1368, subdivision (b), states: "If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369 . . . ."

3

"For the most part, Mr. Foster understood the charges, that they were felonies and that he could get prison time. He recalled his adjudication in 2006. He was generally aware of the pleas and deal making process. He grasped the meaning of evidence, but was unrealistic about his chances of winning a jury trial if he represented himself. He is grandiose about his ability to go *pro per*. His suspiciousness of his public defender is not uncommon among defendants. His attempt to make an issue over the 'present ability' clause [of the assault statute] impresses me as an immature effort to find a loophole. When I confronted him about it he seemed to back off somewhat.

"Although I see the problems [defense counsel] is having, and I am concerned about Mr. Foster's participation in his case, I don't think he meets the threshold for incompetence at this point. While there are some areas in which he expresses delusional beliefs, I believe he has enough presence of mind to work with counsel. More of a relationship needs to be attempted, and I suggest that [defense counsel] set up a joint meeting with Mr. Foster and his mother. The mother can be an ally in coaxing him to be more reasonable about his adjudication. She should be asked to weigh in on him not pursuing self-representation.

"I would also recommend that [defense counsel] ask the mental health team to evaluate Mr. Foster. Maybe he would take a prescribed medication on a voluntary basis.

"Despite some reservation, it is my opinion that Mr. Foster is borderline competent to be adjudicated at the present time."

Dr. Good expressed no further opinion on whether appellant was competent to represent himself.

On April 12, 2011, the trial court, Judge Haynes, held a competency hearing. The district attorney and defense counsel agreed to forego a jury trial on competency, instead submitting the matter to the trial court based on Dr. Good's report. The trial court found defendant competent.

At the same hearing, defendant reiterated his desire to represent himself. The trial court addressed this issue separately from competency to stand trial. Thus, after finding defendant competent to stand trial, the trial court moved on to other matters while giving defendant time to complete a waiver of counsel form. On that form, defendant acknowledged he was appraised of and understood his constitutional rights, the dangers

4

to self-representation, and the court's advisement not to represent himself. Defendant also noted he was a high school graduate and had attended Contra Costa College and New Mexico State University. When the trial court recalled defendant's case, the trial court questioned defendant at length about his desire to represent himself. The trial court then granted defendant's request to proceed in propria persona, stating:

> "Even though I have considered Doctor Good's report, I'm giving great weight to the on-the-record conversation I've had with the Defendant here today and also the written form that he has filled out.
>
> "[¶] . . . [¶]
>
> "Now, while Doctor Good may not have thought it was a very good idea for Mr. Foster to go Pro Per, I don't think it's a very good idea either but that's not my decision, it's Mr. Foster's decision, and I do believe he does meet the minimum standards for competency regarding self representation and I will approve his Pro Per as of status today.
>
> "I make the following findings, [b]ased on his written declaration and my observations of him today, my discussion with him this afternoon, I find that he has voluntarily, intelligently and with full understanding as to the dangers and disadvantages of self representation chosen to represent himself and to give up his right to counsel including court-appointed counsel without charge."

Defendant represented himself from this point forward, through trial and sentencing.

On several occasions, the trial court asked defendant to confirm his choice. At the June 7, 2011 arraignment, defendant confirmed he still wanted to represent himself, and the trial court collected a second waiver form, and again questioned defendant to satisfy itself defendant was voluntarily and intelligently waiving his right to counsel. At the start of trial on August 10, 2011, the trial judge—a different judge, Judge Landau—discussed with defendant how the trial would proceed and alerted defendant to several issues that might arise during and after trial because of his choice to remain in propria persona. Defendant once again affirmed his decision. Finally, after the jury found defendant

5

guilty as charged, Judge Landau cautioned defendant that sentencing was complicated and asked him if he would like to rethink his decision to self-represent. Defendant declined.

On August 31, 2011, the trial court sentenced defendant to an aggregate eight-year prison term. It imposed a principal term (see § 1170.1 regarding principal and subordinate terms) of four years for assaulting a peace officer. It then imposed, as a subordinate consecutive term, one year for the assault on Tam, and consecutive to that, an additional and full three-year term for the great bodily injury enhancement related to Tam's assault. Punishment for resisting an officer was stayed.

Defendant filed a notice of appeal on October 20, 2011.

## DISCUSSION

### *Self-Representation*

Our Supreme Court has recently affirmed "[d]efendants in criminal cases have a federal constitutional right to represent themselves." (*People v. Johnson* (2012) 53 Cal.4th 519, 523 (*Johnson*), citing *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).)

" 'In the wake of *Faretta*'s strong constitutional statement, California courts tended to view the federal self-representation right as absolute, assuming a valid waiver of counsel.' [Citation.] This view was strengthened by the later decision in *Godinez v. Moran* (1993) 509 U.S. 389 . . . (*Godinez*.) In *Godinez*, the defendant, found competent to stand trial, sought and was allowed to waive counsel and plead guilty. The high court held that he was properly permitted to do so. It rejected the argument that federal law required a higher standard of competence for waiving counsel or pleading guilty than is required to stand trial. [Citation.] California courts, including this one, as well as courts in other jurisdictions, generally interpreted *Faretta* and *Godinez* as prohibiting states from imposing a higher standard of competency for self-representation than the standard of competency to stand trial." (*Johnson*, *supra*, 53 Cal.4th at pp. 526–527.)

6

"In *Indiana v. Edwards* (2008) 554 U.S. 164 . . . (*Edwards*), however, the United States Supreme Court held that states may, but need not, deny self-representation to defendants who, although competent to stand trial, lack the mental health or capacity to represent themselves at trial—persons the court referred to as 'gray-area defendants.' (*Id.* at p. 174.)" (*Johnson*, *supra*, 53 Cal.4th at pp. 523, 527.) " 'The court in *Edwards* did not hold . . . that due process mandates a higher standard of mental competence for self-representation than for trial with counsel. The *Edwards* court held only that states *may,* without running afoul of *Faretta,* impose a higher standard . . . .' " (*Id.* at p. 527, quoting *People v. Taylor* (2009) 47 Cal.4th 850, 877–878 (*Taylor*).)

In *Taylor,* the court had concluded: " '*Edwards* did not alter the principle that the federal constitution is not violated when a trial court permits a mentally ill defendant to represent himself at trial, even if he lacks the mental capacity to conduct the trial proceedings himself, if he is competent to stand trial and his waiver of counsel is voluntary, knowing and intelligent.' [Citation.] *Edwards* thus does not support a claim of federal constitutional error in a case . . . in which defendant's request to represent himself was granted." (*Taylor, supra*, 47 Cal.4th at p. 878; see also *Johnson, supra,* 53 Cal.4th at p. 527.)

*Johnson* presented the reverse scenario, in which the trial court denied self-representation. (*Johnson*, *supra*, 53 Cal.4th at p. 525.) On appeal, the defendant contended the trial court's denial was error. Our high court disagreed. Although *Edwards* did not mandate a higher standard of mental competence for self-representation than for standing trial, it allowed state trial courts to deny self-representation to "gray-area" defendants, an invitation the Supreme Court accepted on behalf of California. (*Johnson*, at p. 528.) Following *Edwards*, the heightened competency standard "trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of

7

counsel." (*Id.* at p. 530.) "Trial courts must apply this standard cautiously," however, as "defendants still generally have a Sixth Amendment right to represent themselves" that "may not be denied lightly." (*Id.* at p. 531.)

As a result of *Edwards* and *Johnson*, California trial courts may deny a defendant pro per status if the court believes he or she is incompetent to represent himself at trial. But that is a different question from whether a trial court is *required* to deny self representation, and if so, whether a failure to do so deprives defendant of a fair trial. As already noted, there is no "federal constitutional error" in allowing a defendant to represent himself if that defendant is, as here, found competent to stand trial. (*Johnson, supra,* 53 Cal.4th at p. 527.)

And *Johnson*, applying *Edwards*, does not address whether or under what circumstances a California trial court must, as opposed to may, apply a heightened, state-law test of competence to a defendant's request for self-representation. Rather, *Johnson* and *Edwards* simply " 'permit[] judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so.' " (*Johnson*, *supra*, 53 Cal.4th at p. 527, quoting *Edwards*, *supra*, 554 U.S. at p. 177.) In fact, under *Johnson*, "[a] trial court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so on*ly if it is considering denying self-representation* due to doubts about the defendant's mental competence." (*Johnson*, at p. 530, italics added.) If that is the case, "it *may* order a psychological or psychiatric examination to inquire into *that* question." (*Ibid.*, first italics added.) "To minimize the risk of improperly denying self-representation to a competent defendant, 'trial courts should be cautious about *making an incompetence finding* without benefit of an expert evaluation, though the judge's own observations of the defendant's in-court behavior will also provide key support for an incompetence finding and should be expressly placed on the record.' " (*Id.* at pp. 530–531, italics added.)

8

Even assuming *Johnson*'s heightened competency standard applies to this case—in which the trial court *granted*, not denied, self-representation—we still "must defer largely to the trial court's discretion" in application of that standard and act cautiously to protect the right to seek self representation. (*Johnson*, *supra*, 53 Cal.4th at p. 531.) "The trial court's determination regarding a defendant's competence must be upheld if supported by substantial evidence." (*Ibid*.) Trial judges " 'will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant.' " (*Id.* at p. 532.)

We find no error here. Although the trial court did not, in the end, obtain the separate analysis it had requested from Dr. Good of defendant's competence to represent himself, the trial court nonetheless, and correctly, viewed competence to self-represent as a distinct matter from competence to stand trial. This is shown by the court's very request for the additional analysis and its separate consideration of the two competency issues at the April 12, 2011 hearing. The trial court could have asked for further elaboration by Dr. Good as to his opinion on defendant's competency to represent himself; the law, however, does not require it. (*Johnson*, *supra*, 53 Cal.4th at p. 530 [trial court "may" order an analysis if it is considering denial of the right to self represent].) Meanwhile, Dr. Good's report concluded despite there being "some areas in which [defendant] expresses delusional beliefs" (that is, grandiose or illogical beliefs about the law and his chances for success at trial), defendant did not meet "the threshold for incompetency," at least to stand trial. While the report stated defendant was previously diagnosed as bipolar in 2006, the report did not establish defendant was currently exhibiting the effects of this disorder or some other psychiatric condition. Judge Haynes recognized Dr. Good's belief that self representation was a bad idea, and agreed with Dr. Good on this point, but correctly focused on defendant's competence, not the wisdom of self representation. (See *Godinez v. Moran*, *supra*, 509 U.S. at p. 399 ["competence that is required of a defendant seeking to waive his right to counsel is the competence to

9

*waive the right,* not the competence to represent himself"].)  Both Judges Haynes and Landau, two separate judges, repeatedly discussed the perils of self-representation with defendant, and defendant appears to have understood these discussions while making it unequivocally clear he wanted to represent himself despite the perils.

Defendant points to several incidents during trial he claims shows he was not competent to self-represent, but these incidents in fact show him to be poorly trained in the law, not mentally incompetent.  His request, for instance, to reopen his opening statement so he could tell the jury of purported educational experiences that exposed him to the law was a rational attempt to bolster his credibility as an advocate, even if such bolstering was not permitted under evidentiary rules.  (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1073 ["delusional" claims boasting of education not sufficient evidence of incompetence]; *People v. Butler* (2009) 47 Cal.4th 814, 824 [" ' " 'technical legal knowledge' is irrelevant to the court's assessment of the defendant's knowing exercise of the right to defend himself" " ' "].)  His stubborn insistence on an untenable interpretation of the law of assault again represents a lack of legal training or understanding.  Dr. Good viewed it not as a mental defect, but as "an immature effort to find a loophole" from which defendant seemed to back off from when confronted by the doctor.  (See *Godinez v. Moran*, *supra*, 509 U.S. at p. 400 ["a criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation"], italics omitted; *People v. Koontz*, *supra*, 27 Cal.4th at p. 1073 ["a proclivity to boast or exaggerate, a tendency to digress in argument, a shaky grasp of the legal concept of relevancy, even a certain tangentiality in speech patterns does not necessarily mean that a defendant lacks a rational and factual understanding of the proceedings, the basic criterion for competency"].)

Defendant may have handled his representation poorly, but we will not second-guess the decisions, supported by substantial evidence, of two different judges that defendant was competent to represent himself.  (See *Edwards*, *supra*, 554 U.S. at p. 177

10

[a "trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individual circumstances of a particular defendant"].)

### *Sufficiency of Evidence to Support Great Bodily Harm Enhancement*

The jury found defendant inflicted great bodily injury against Tam while assaulting him, a finding that enhanced defendant's punishment under section 12022.7, subdivision (a). That subdivision provides: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a).)

Defendant asserts there was insufficient evidence to support the jury's finding. Indeed, "[w]hether great bodily injury occurred is a question of fact, and we review a jury's finding of great bodily injury under the substantial-evidence standard." (*People v. Le* (2006) 137 Cal.App.4th 54, 59.) To apply this standard, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

"Great bodily injury is defined as 'a significant or substantial physical injury.' " (*People v. Meneses* (2011) 193 Cal.App.4th 1087, 1090, quoting § 12202.7, subd. (f).) A " 'significant or substantial physical injury' need not meet any particular standard for severity or duration, but need only be 'a substantial injury *beyond* that inherent in the offense itself.' " (*People v. Le*, *supra*, 137 Cal.App.4th at p. 59, quoting *People v. Escobar* (1992) 3 Cal.4th 740, 746–747.) Great bodily injury can include loss of consciousness (*People v. Beltran* (2000) 82 Cal.App.4th 693, 696) or the breaking of bones (*In re Cruse* (2003) 110 Cal.App.4th 1495, 1498 ["[w]hen her jaw was broken, she suffered great bodily injury within the meaning of section 12022.7, subdivision (f)"]; *People v. Kent* (1979) 96 Cal.App.3d 130, 136 [breaking of hand]). The evidence amply

shows defendant hit Tam with a rock, rendering him unconscious and seriously fracturing his skull, both constituting great bodily injury.

### *Sentencing*

The trial court enhanced defendant's subordinate term—the one-year term for assaulting Tam—with a full three-year consecutive term for the great bodily injury enhancement under section 12022.7, subdivision (a). Both defendant and the Attorney General agree this was error. Section 1170.1, which governs consecutive sentencing, provides: "The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, and shall include *one-third of the term imposed for any specific enhancements* applicable to those subordinate offenses." (§ 1170.1, subd. (a)., italics added; see also § 1170.11 [section 12202.7 enhancement is a "specific enhancement"].) Thus, if enhancing a subordinate term, the trial court could only add one year, not three, for the three-year enhancement set forth in section 12022.7, subdivision (a).

We shall remand for resentencing so the trial court may exercise its discretion properly. (See *People v. Rodriguez* (2009) 47 Cal.4th 501, 509 ["Remand will give the trial court an opportunity to restructure its sentencing choices in light of our conclusion . . . ."].)

## DISPOSITION

The matter is remanded for resentencing in accord with this decision. In all other respects, the judgment is affirmed.

                              _____

                              Banke, J.

We concur:

_____

Margulies, Acting P. J.

_____

Dondero, J.

13