Filed 2/26/13  P. v. Vick CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA VICK,<br><br>    Defendant and Appellant. | B233361<br><br>(Los Angeles County<br>Super. Ct. No. BA255265) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Bob S. Bowers, Jr., Judge.  Affirmed.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

After a court trial, defendant was found guilty of three counts of special circumstance murder (Pen. Code, § 187, subd. (a)[1]; counts 1, 2 & 3); one count of second degree robbery (§ 211; count 5), one count of attempted second degree robbery (§§ 664/211; count 8), and three counts of criminal threats (§ 422; counts 9, 10 & 11). The trial court found true the firearm enhancement allegations pursuant to section 12022.5, subdivision (a)(1) in counts 1, 2, 3, and 5. The trial court found true the firearm enhancements pursuant to section 12022.53, subdivisions (b), (c), and (d) in counts 1, 2 and 3.

The trial court sentenced defendant to state prison for three consecutive sentences of life without the possibility of parole (LWOP), plus 75 years to life, plus seven years six months. The sentence consisted of the following: in counts 1, 2 and 3, LWOP plus 25 years to life on each count for the firearm enhancement; in count 5, a consecutive midterm sentence of three years plus four years pursuant to section 12022.5, subdivision (a); in count 8, a consecutive midterm sentence of six months; and in counts 9, 10 and 11, a concurrent midterm sentence of two years for each count.

Defendant appeals on the grounds that: (1) the trial court's unjustified revocation of his right to proceed in propria persona is reversible error; and (2) there was insufficient evidence in support of the criminal threat charges in counts 9 and 11.

## FACTS

**Prosecution Evidence**

On January 13, 2005, defendant was living with his parents, Gabriel and Mary Vick in Los Angeles.[2] Defendant was doing odd things "all the time." For example, he would not eat because he thought he was being poisoned, and he would stare at the wall and talk to his sister rather than look at her. He was not taking medication regularly.

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

[2]     We refer to defendant's parents by their first names in order to avoid confusion.

2

When he got arrested, he would be given medication, but when he was released, there were no resources for it.

On January 14, 2005, police received a late-night call to the apartment complex where defendant's parents lived. Mary's body was found at the bottom of an outdoor flight of stairs at the Vicks' apartment building. She had injuries to her head and back. A blood trail and ballistics evidence indicated that Mary had been shot inside the apartment before going outside and falling down the stairs, where she was shot again. Gabriel was found lying face down on the floor near the bathroom. He had been shot once in the head. He was breathing but unconscious. He eventually died from his wounds.

Michael Bradley[3] was friends with Tesha Collins, who was in a relationship with defendant. Collins and defendant had a child who was around two years old in 2005. Their relationship was "not good." In January 2005, Collins was living both in her own apartment in Los Angeles and her friend Bridgette's house[4] in Pasadena, where Bradley also lived. Collins was doing this because defendant had taken over Collins's apartment, since "he had her so scared she was scared to go home."

Bradley testified that defendant kept calling the house in Pasadena and "threatening all of us, the whole household and everything." On or around November 20, 2004, they had to have the Los Angeles police department go with them to change the lock on Collins's apartment because defendant would not leave it. When they arrived, defendant ran out the back door, and the police stayed with the women while they changed the lock. That night, defendant called Bridgette's home and told them that they had his keys, and if they did not take his keys to his mother's house, he was going to kill "all three of us bitches." He said this to Bradley on the telephone. Bradley was placed in fear and apprehension of her life and testified that "we called the Pasadena police department."

---

**3**     The record indicates that Bradley also uses the first name "Michelle."

**4**     The record indicates that Bridgette's last name is "Pittman."

Collins worked as a teacher's assistant at the Hooper Early Education Center. Early in the morning of January 14, 2005, defendant went to the school and forced Collins to leave with him at gunpoint.

On the same day, defendant approached Lemuel Jackson, a service technician for the phone company, while Jackson was standing at his truck. Defendant brandished a .22-caliber handgun and said, "give me your money." Defendant took Jackson's wallet and fled. Also on the same day, defendant approached Roberto Orantes with a gun while Orantes waited at a bus stop. Defendant demanded money, and Orantes told defendant he did not have any. Defendant patted him down, found no wallet, and left in his car.

On January 15, 2005, at around 8:55 a.m., Officer James Williams of the Los Angeles Police Department (LAPD) participated in a traffic stop of defendant's vehicle in the area of 88th Street and Main Street. Officer Williams ordered defendant to stop the car, throw out the keys, and get out with his hands on his head. Defendant complied and began walking backwards toward the officer in very small steps, all the while looking inside the vehicle. Officer Williams assumed defendant was speaking to the female passenger, later identified as Collins. When defendant was almost at the rear of the car, he ran forward and jumped inside the car. He struggled with the female passenger. At one point she broke free, and Officer Williams heard a gunshot.

After the gunshot, Officer Williams and other officers began firing. When the shooting stopped, Collins was outside the vehicle, lying against the passenger door. Defendant was still inside. Officer Williams ordered defendant to exit his car. Officer Williams then heard two gunshots and saw Collins's head move. Defendant was eventually pulled out of the car and handcuffed. He had been shot and was taken to the hospital. Police found a number of .32-caliber shell casings at the scene of the shooting and one inside defendant's car. A semiautomatic .32-caliber pistol was also found in defendant's car. The LAPD does not use .32-caliber ammunition.

Detective Dennis English interviewed defendant in the hospital. The interview was recorded. Defendant confessed to the murders of his parents and the kidnapping and shooting of Collins. Defendant killed Collins because he knew he was either going to

4

prison or would be killed for murdering his parents, and he could not bear the thought of her living. Defendant killed his mother because he thought she was poisoning his food, and she would not give him money to buy milk. Defendant killed his father because he did not want his father to live without his mother. Defendant also admitted to committing numerous armed robberies.

**Defense Evidence**

Defendant testified on his own behalf. He testified that he was taking Depakote and other medications he could not name. He did not kill his parents or Collins. Defendant and Collins were in the car because they were going to do laundry. He did not kidnap her from the daycare center. He had told Collins that he was moving out and "it was over." Collins began scratching and hitting his hand on the steering wheel and saying, "no." When he swerved, the police pulled him over and ordered him out of the car. As defendant was walking back to the police, he heard some gunshots go off inside the car. He got back in and saw that Collins "had blew her own brains out, and she was putting the gun on the floor." He said she then "opened the door and got out the car and got on her knees."

Defendant was taken to the hospital, but he did not speak with Detective English. Defendant had heard the recording of a conversation that purported to be between him and the detective but that was not his voice on the recording. He had no idea who murdered his parents. Defendant did not think he had a mental illness.

## PROCEDURAL HISTORY

On March 28, 2005, an 11-count indictment was filed against defendant, and he pleaded not guilty to all charges and denied all special allegations. On September 7, 2005, the prosecution announced it would seek the death penalty. On January 23, 2006, the trial court declared a doubt as to defendant's mental competence pursuant to section 1368, and two doctors were appointed to examine defendant pursuant to Evidence Code section 730.

5

On April 6, 2006, defendant waived trial by jury. On the same day, the trial court found that defendant was not mentally competent to stand trial within the meaning of section 1368. The trial court recommended placement in Patton State Hospital.

On July 11, 2006, the medical director of Patton State Hospital filed a report certifying defendant's mental competence, and on July 14, 2006, the trial court found defendant was mentally competent to stand trial under section 1368.

On September 5, 2006, defense counsel declared a doubt as to defendant's mental competence, and the trial court concurred. Two doctors were appointed to examine defendant. The court read the reports and declared defendant mentally competent to stand trial on October 3, 2006.

On October 16, 2007, defendant requested to proceed in pro. per. The trial court denied the request. On December 6, 2007, the trial court again denied defendant's request to represent himself at trial. At the trial court's request, on February 20, 2008, defendant's counsel provided the court with points and authorities regarding defendant's request to proceed in propria persona. The trial court appointed a doctor to evaluate defendant to see if he was competent to waive his right to an attorney and proceed in pro. per. On April 3, 2008, the trial court found defendant was competent to waive his right to counsel and to proceed in pro. per. The trial court granted defendant's *Faretta* motion.[5]

On June 6, 2008, the trial court received a memo from the Sheriff's Department stating that defendant's pro. per. privileges had been suspended due to defendant's behavior and "the safety of others in the pro per unit." The minute order for August 26, 2008, states that the People requested the court to revoke defendant's pro. per. status.[6] On October 17, 2008, the trial court rescinded defendant's pro. per. status pursuant to *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*). On January 8, 2009, the trial court denied another request by defendant to represent himself.

---

[5]     *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

[6]     The reporter's transcript for this day is incomplete and stops in mid-sentence before the prosecutor set forth the People's position.

6

After declaring a doubt as to defendant's competency to stand trial on June 28, 2010, the trial court appointed doctors to examine him. Defendant was found to be competent on October 12, 2010.

On January 27, 2011, the prosecution announced it was no longer seeking the death penalty. Defendant waived his right to a jury trial. On April 27, 2011, the trial court dismissed the robberies charged in counts 6 and 7 pursuant to section 1385. The trial court acquitted defendant of count 4 (kidnapping to commit another crime). It found defendant guilty of the remaining charges.

## DISCUSSION

### I. Revocation of Defendant's *Faretta* Rights

#### A. *Defendant's Argument*

Defendant contends the trial court committed reversible error when it revoked his right of self-representation. Citing *People v. Johnson* (2012) 53 Cal.4th 519 (*Johnson*), defendant argues that the trial court's justifications for revoking this right did not constitute substantial evidence of defendant's incompetence. Therefore, defendant argues, the error is reversible per se, and the judgment must be reversed.

#### B. *Relevant Authority*

A trial court must allow a defendant to represent himself if he knowingly and intelligently makes an unequivocal and timely request. (*Faretta*, *supra*, 422 U.S. at pp. 835-836; *People v. Valdez* (2004) 32 Cal.4th 73, 97-98.) States may limit a defendant's self-representation right by insisting upon representation by counsel at trial on the ground that the defendant lacks the mental capacity to conduct his defense unless represented. (*Edwards*, *supra*, 554 U.S. at p. 174.) California courts have discretion to deny self-representation to these so-called gray-area defendants—those who are mentally competent to stand trial if represented by counsel but not mentally competent to conduct the trial themselves—"in those cases where *Edwards* permits such denial." (*Johnson*, *supra*, 53 Cal.4th at p. 528.) "As with other determinations regarding self-representation, we must defer largely to the trial court's discretion." (*Id*. at p. 531.) The trial court's ruling regarding a defendant's competence will be upheld if supported by substantial

7

evidence.  (*Ibid*.)  "*Faretta* error is reversible per se."  (*People v. Valdez*, *supra*, 32 Cal.4th at p. 98.)

### C.  Trial Court's Ruling

In rescinding defendant's pro. per. privileges on October 17, 2008, the trial court told defendant that it had read and considered *Edwards*.  The trial court noted that defendant's was a capital case.  Defendant had told the court that he believed his parents were killed as a result of a burglary, and that his girlfriend had committed suicide.  The court stated that, since being granted the right to represent himself, defendant had not asked for or done the types of things that the court would believe a person charged with these crimes would do or request from the court in preparation for trial.  The court, based on its observations and the history of the matter, did not believe that defendant had a sound understanding of exactly what it was he was charged with or how to defend himself in the fundamental sense.  The court stated that it "therefore believes that the defendant's lack of mental capacity threatens an improper conviction or that his representation would fundamentally undercut one of the prime objectives in a criminal trial, and that is to provide a fair trial.  For those reasons, the pro. per. status at this point is rescinded by court order."

Defendant renewed his request to represent himself on January 8, 2009.  The trial court stated, "You know, again, and I will take the time to explain as best I can.  I believe, based upon what I have seen, that in my opinion as a bench officer, not so much it's not in your best interest to represent yourself, but I don't believe that a case of this consequence, that you could effectively represent yourself."

### D.  No Abuse of Discretion

We believe that the trial court correctly applied *Edwards* to the circumstances of defendant's case, and there was no abuse of discretion.[7]  *Johnson*, which was decided

---

[7]  Respondent argues that defendant forfeited this claim.  Although defendant did not object to the revocation of his pro. per. status immediately, at the next proceeding he again requested his *Faretta* rights.  Under these circumstances, we cannot say that

after defendant's trial, serves to bolster our conclusion that the trial court properly revoked defendant's pro. per. status. Defendant relies heavily on language from cases that preceded the *Edwards* decision—cases such as *Dusky v. United States* (1960) 362 U.S. 402 (*Dusky*), *Drope v. Missouri* (1975) 420 U.S. 162 (*Drope*), *Godinez v. Moran* (1993) 509 U.S. 389 (*Godinez*), and *Faretta* itself—all cases that the *Edwards* court found not particularly helpful in deciding the issue presented. Because the rationale of *Edwards* is at the heart of the issue in this case, we believe a more thorough analysis of *Edwards* and *Johnson* than that engaged in by defendant is called for.

In *Edwards*, the United States Supreme Court stated that its precedents did not answer the question as to whether the federal Constitution prohibits a state from insisting that the defendant proceed to trial with counsel (and denying the defendant the right to represent himself) when the state court finds the defendant mentally competent to stand trial if represented, but not mentally competent to conduct the trial himself. (*Edwards*, *supra*, 554 U.S. at pp. 167, 169.) The chief precedents on the standard for mental competency (*Dusky*, *supra*, 362 U.S. 402, and *Drope*, *supra*, 420 U.S. 162) did not consider the relation of the mental competence standard to the right of self-representation. (*Edwards*, *supra*, 554 U.S. at pp. 169-170.) The foundational self-representation case, *Faretta*, did not answer the question for two reasons: it did not consider the issue of mental competency, and *Faretta* and later cases made clear that the right of self-representation is not absolute. (*Edwards*, at pp. 170-171; see also *People v. Butler*, *supra*, 47 Cal.4th at p. 825.) Nor did *Godinez*, *supra*, 509 U.S. 389, answer the question. (*Edwards*, at p. 173.) The court recognized that its emphasis in *Godinez* on the need to consider only the defendant's "'competence to *waive the right*'" and the absence of the need to consider the defendant's "'technical legal knowledge'" about how to conduct a trial stemmed from the fact that the *Godinez* defendant sought only to change his pleas to guilty, not to conduct trial proceedings. Thus, "his ability to conduct a

defendant forfeited the right to represent himself. (See, e.g., *People v. Butler* (2009) 47 Cal.4th 814, 826, fn. 3.)

9

defense at trial was expressly not at issue," a "critical" difference. (*Edwards*, at p. 173.) In addition, *Godinez's* constitutional holding was only that a state may *permit* a gray-area defendant to represent himself. It did not tell a state whether it might *deny* the same type of defendant the right to represent himself, which was at issue in *Edwards*. (*Edwards*, at p. 173.)

The consideration of various factors, taken together, led the *Edwards* court to hold that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Edwards*, *supra*, 554 U.S. at p. 178.) In explaining its rationale, *Edwards* first observed that the court's "'mental competency'" cases focused upon a defendant's ability to consult with his attorney and *assumed* representation by counsel, which suggested that, when such a defendant sought to forego counsel, a different standard was called for. (*Id*. at pp. 174-175.) The court pointed out that *Faretta* itself "rested its conclusion in part upon pre-existing state law set forth in cases all of which are consistent with, and at least two of which expressly adopt, a competency limitation on the self-representation right." (*Edwards*, at p. 175.) Secondly, the complex nature of mental illness and mental competency, with its tendency to vary in degree and over time as well as in its effect on the individual, cautions against employing the same standard for determining whether a represented defendant can stand trial and whether a defendant must be allowed to represent himself at trial. (*Id*. at p. 175.) Third, allowing a defendant with an uncertain mental state to represent himself would not affirm the dignity and autonomy of the individual, which are the underpinnings of the right to represent oneself. (*Id*. at p. 176.)

The *Edwards* court also observed that self-representation by a defendant who lacked the capacity to do so would "undercut[] the most basic of the Constitution's criminal law objectives, providing a fair trial." (*Edwards*, *supra*, 554 U.S. at pp. 176-177.) Moreover, the trial must not only be fair, its fairness must be apparent to all. (*Id*. at p. 177.) The *Edwards* court concluded that there was little reason to believe that

10

application of *Dusky's* basic mental competence standard was sufficient. (*Edwards*, at p. 177.) The court believed that the trial judge would often be the most able to make the necessary, finely tuned decisions with respect to the defendant's mental capacity, based on the defendant's individualized circumstances. (*Id*. at p. 177.)

In *Johnson*, the California Supreme Court decided that California courts may "accept [the] invitation" extended by *Edwards* and "apply a higher standard of mental competence for self-representation than for competency to stand trial." (*Johnson*, *supra*, 53 Cal.4th at p. 523.) The court stated that, "[b]ecause California law—which, of course, is subject to the United States Constitution—has long been that criminal defendants have *no* right of self-representation . . . California courts may deny self-representation when the United States Constitution permits such denial. (*Ibid*.) (Italics added.) The standard trial courts should apply when deciding whether to exercise their discretion to deny self-representation is "whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id*. at p. 530.) Trial courts may order a psychological or psychiatric examination to inquire into the issue of doubts about the defendant's mental competence for self-representation. (*Ibid*.) The judge's own observations will also provide support for an incompetence finding. (*Id*. at p. 531.) The denial of self-representation, however, must not be done lightly, or for the purpose of increased efficiency or even fairness. (*Id*. at p. 531.) Reviewing courts must "defer largely to the trial court's discretion" and uphold the trial court's ruling if supported by substantial evidence. (*Ibid*.)

In the instant case, unlike in *Edwards* and *Johnson*, we do not have a defendant who wrote and presented the court with "bizarre" documents. (See *Edwards*, *supra*, 554 U.S. at pp. 176, 179; *Johnson*, *supra*, 53 Cal.4th at pp. 532-533 & fn. 2.) We do not have a record of bizarre or disruptive behavior in the courtroom. (See *Johnson*, at p. 525.) Nor do we have the convenience of a finding by the instant trial court like the one made

11

by the trial court in *Johnson*, which employs the exact wording of the amicus brief by the American Psychiatric Association (APA) quoted in *Edwards*.[8]

We nevertheless have sufficient substantial evidence to uphold the trial court's revocation of defendant's *Faretta* right, although the evidence differs from that of *Edwards* and *Johnson*. The trial court presided over this case beginning April 5, 2005, and rescinded defendant's *Faretta* right on October 17, 2008. Both the court and defendant's counsel had declared doubts over his competency to stand trial several times. By the time *Faretta* rights were rescinded, the court had considered approximately six reports from mental health practitioners regarding defendant's competency. It had presided over several competency hearings and hearings on defendant's *Faretta* motions. The court had ample opportunity to observe defendant, an opportunity this court did not have. And although defendant was passive in court, he was barred from the pro. per. unit by sheriff's deputies because he was a danger to the safety of others. This occurred just prior to the rescission of his pro. per. status.

The trial court was clearly concerned that self-representation by defendant would undercut "the most basic of the Constitution's criminal law objectives," i.e., the providing of a fair trial, and it expressly so stated. (See *Edwards*, *supra*, 554 U.S. at pp. 176-177.) In fact, defendant had not done anything in furtherance of his defense. As its comments indicated, the trial court clearly believed that defendant, due to his mental illness, was not capable of carrying out the basic tasks required to present a defense—tasks such as organizing a defense, making motions, and questioning witnesses. (See *Edwards*, *supra*, at p. 176; *Johnson*, *supra*, 53 Cal.4th at p. 530.) Defendant cites *People v. Teron* (1979)

---

[8]    The *Edwards* court cited with approval the APA's brief, which stated that "'[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.'" (*Edwards*, *supra*, 554 U.S. at p. 176.) The trial court in *Johnson* used this paragraph as the basis for its finding when revoking the defendant's self-representation status. (*Johnson*, *supra*, 53 Cal.4th at p. 525.)

23 Cal.3d 103, 115, for the proposition that "a defendant's right of self-representation includes the right to decline to conduct any defense whatsoever." The *Teron* court actually stated that, "the decision to plead guilty, or simply not to oppose the prosecution case, is one which a *competent* defendant has a right to render." (*Id*. at p. 108, italics added.)

The record shows that the trial court had granted defendant his pro. per. status reluctantly. The trial court cited the rule of *Godinez* that the competence required of a defendant seeking to waive his right to counsel is merely the competence to waive the right. The court also noted that, under *Godinez*, a defendant's ability to represent himself has no bearing on his competence to choose to do so. The trial court stated, "And as much as I struggle with this, I think that in essence says it all." The court continued, "at this point . . . it has no other choice but to grant Mr. Vick's request." The trial court expressly found that defendant was "competent enough to waive the right to counsel in this matter." Although *Godinez* may have said it all at the point when the trial court granted defendant's *Faretta* right, the United States Supreme Court had more to say. With the handing down of *Edwards* approximately two and a half months later, the trial court was given another choice.

Defendant discusses at length the sealed report provided by Dr. Markman for the purpose of aiding the court in its determination of whether to grant defendant pro. per. status. This court allowed appellate counsel to read the report but ordered that the report remain sealed. It is true that Dr. Markman ultimately stated that defendant was competent to waive counsel. This occurred prior to the *Edwards* decision, however, when *Godinez* was the only authority on the subject. At the hearing where the trial court rescinded defendant's *Faretta* rights, it noted that Dr. Markman had grave reservations and misgivings.

The trial court demonstrated a clear understanding of the rationale of *Edwards*, and applied the *Edwards* standard cautiously, as later mandated by *Johnson*. (*Johnson*, *supra*, 53 Cal.4th at p. 531.) Because defendant was not obstreperous in court, the trial court's decision here was of necessity more finely tuned. (See *Edwards*, 554 U.S. at p.

13

177.) There is absolutely no indication that the trial court terminated defendant's pro. per. status for reasons of efficiency or to level the playing field. (See *Johnson*, at p. 531.) The trial court obtained expert evaluation, as urged by *Johnson*. (*Id*. at p. 530) Defendant refers to selective portions of Dr. Markman's report, but our reading of the report conforms with the trial court's opinion that Dr. Markman had "grave reservations." Without citing specifically from the sealed report, we believe it reveals that Dr. Markman's opinion that defendant was competent to waive counsel focused on the act of the waiver itself, as the state of the law at that time required. (*Godinez*, *supra*, 509 U.S. at p. 399.) We conclude that the trial court did not abuse its discretion in revoking defendant's right to represent himself.

## II. Sufficiency of the Evidence in Counts 9 and 11

### A. Defendant's Argument

Defendant contends the evidence was insufficient to prove the criminal threat charges in counts 9 and 11, and reversal of these counts is required. Defendant asserts there was no substantial evidence that either Collins or Pittman were aware of any purported threat by defendant or that the threat caused either of them to be in sustained fear of her safety or that of her immediate family.

### B. Proceedings Below

Defendant was charged in counts 9, 10, and 11 with making criminal threats in violation of section 422 against Collins, Bradley, and Pittman, respectively. As noted in the facts section of this opinion, Bradley testified that, while Collins was staying at Pittman's home, defendant kept calling and threatening all of them. One night, after Collins changed the lock on her apartment door, defendant called Pittman's house and spoke with Bradley. He said that they had his keys and if they did not take his keys to his mother's house he was going to kill all three of "us bitches." This occurred approximately on November 20, 2004.

### C. Relevant Authority

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is

reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) "The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432.) The same standard applies regardless of whether the evidence is direct or circumstantial. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) Reversal is only warranted where it clearly appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331.)

Section 422 provides in pertinent part that "[a]ny person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." (§ 422, subd. (a).)

"Section 422 does not require that a threat be personally communicated to the victim by the person who makes the threat. [Citation.]. Nevertheless, . . . the statute 'was not enacted to punish emotional outbursts, it targets only those who try to instill fear in others.' [Citation.] In other words, section 422 does not punish such things as 'mere angry utterances or ranting soliloquies, however violent.' [Citation.] Accordingly, where the accused did not personally communicate a threat to the victim, it must be shown that he specifically intended that the threat be conveyed to the victim. [Citations.]" (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 861.)

15

## C. Evidence Sufficient

Defendant disputes the elements of a violation of section 422 that require the victim to be aware of the threat and to be in sustained fear of his or her own safety or that of his or her immediate family. He states that *In re David L.*, cited by the trial court as support for its "guilty" verdicts, is inapposite, since in that case, the prosecutor *proved* that the third party informed the victim of the defendant's remarks. (See *In re David L.* (1991) 234 Cal.App.3d 1655, 1658.) Because there was no evidence here that Bradley conveyed the threats to Collins or Pittman, he argues, there was no substantial evidence that either woman was in sustained fear as a result of the threat conveyed to Bradley, and the verdicts in counts 9 and 11 must be reversed.

In the instant case, there was substantial evidence that the People proved all of the elements of section 422. When assessing a criminal threat, "the communication and the surrounding circumstances are to be considered together." (*In re Ryan D.*, *supra*, 100 Cal.App.4th at p. 860; see also *People v. Felix* (2001) 92 Cal.App.4th 905, 913; *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137-1138) "The circumstances surrounding a communication include such things as the prior relationship of the parties and the manner in which the communication was made." (*In re Ryan D.*, at p. 860.)

The circumstances of the call defendant made to Bradley show that all three women—Bradley, Collins, and Pittman—were present or soon to be together in Pittman's home. Defendant knew Collins was staying there and that the other two women had helped her change the locks to her apartment. Although defendant spoke only to Bradley, he clearly intended his threat to kill all three of the women (unless he got his keys) to be communicated to all of them, and he intended for all three women to understand his words as threats. The fact that the women contacted the police department demonstrates that they did suffer from a sustained fear that defendant would carry out his threat. As stated in *In re David L.*, "[s]ection 422 does not in terms apply only to threats made by the threatener personally to the victim nor is such a limitation reasonably inferrable from its language. The kind of threat contemplated by section 422 may as readily be conveyed by the threatener through a third party as personally to the intended victim. Where the

16

threat is conveyed through a third party intermediary, the specific intent element of the statute is implicated.  Thus, if the threatener intended the threat to be taken seriously by the victim, he must necessarily have intended it to be conveyed."  (234 Cal. App. 3d at pp. 1658-1659.)

The history of defendant's relationship with Collins and her frequent recourse to her friends, Bradley and Pittman, and the fact that defendant knew to contact Collins through Bradley and at Pittman's home easily support the inference that defendant intended his threat to be taken seriously, and that he therefore intended Bradley to be the intermediary for this threat.  Bradley's testimony confirmed that defendant's words had the desired effect of placing them in fear.  Defendant's argument is without merit.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.


17